GAR ASSOCIATES III, L.P., Appellant,

v.

STATE of Texas, Acting by and Through the Texas Department of Transportation, Appellee.

No. 01–05–00886–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 2, 2006.

Rehearing Overruled Dec. 21, 2006.

David L.H. Payne, James H. Leeland, Hoover Slovacek, L.L.P., Houston, for Appellant.

Jon Rodney Meador, Susan Desmarais Bonnen, Office of the Attorney General, Transportation Division, Austin, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellant, GAR Associates III, L.P. ("GAR"), brings this accelerated interlocutory appeal,[1] challenging the trial court's order granting the plea to the jurisdiction of appellee, the State of Texas, acting by and through the Texas Department of Transportation ("TXDOT"). In four issues, GAR contends that the trial court erred in granting TXDOT's plea because it had subject matter jurisdiction over its inverse condemnation and related injunctive relief claims; the pleadings and evidence on file did not affirmatively negate the trial court's subject matter jurisdiction; GAR "presented sufficient pleadings and evidence conclusively showing, or at least raising issues of material disputed fact, that the trial court had jurisdiction over its inverse condemnation claim"; and "the tri-

---

1. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (Vernon Supp.2005).

al court had jurisdiction over other claims against governmental entities in addition to the inverse condemnation claim against TXDOT."

We affirm the order of the trial court.

### Factual and Procedural Background

In its original petition and application for injunctive relief, GAR alleges that it is "the owner of a number of units located in the condominium complex commonly known as 2016 Main," a twenty-six story building adjacent to a section of Interstate Highway 45 referred to as the "Pierce Elevated." GAR asserts that "[f]or a number of years," GAR and its tenants, guests, contractors, and vendors used an "alley" between 2016 Main and the Pierce Elevated to access the restaurant space in 2016 Main and park "in the public parking area" below the Pierce Elevated (the "parking area"). However, in 2004, the Metropolitan Transit Authority of Harris County ("METRO") began preventing GAR's and the public's access to the alley and the use of the parking area by first erecting steel posts in one of the entrances to the alley and then fencing in the alley and the parking area.

GAR also alleges that on January 24, 2005, it leased one of the units, the first-floor restaurant space, to Sammy's Place Midtown, Ltd. ("Sammy's"). GAR complains that its lease with Sammy's, which it attached to its petition, is contingent on the availability of and access to the alley and parking area. The lease provides Sammy's a time-limited right of termination if the parking area becomes unavailable. GAR also complains that the entrance to the restaurant space from the alley is "an indispensable part of the [r]estaurant's activities" and that the restriction of access to this entrance interferes with GAR's and its tenant's right to use and enjoy the restaurant and substantially diminishes the value of the restaurant space.

GAR also attached to its petition a copy of a City of Houston ordinance passed in June 1968, titled, "An Ordinance Authorizing the Mayor to Execute ... a Master Agreement for Construction, Maintenance and Operation of Off–Street Parking and Other Appropriate Uses on State Highway Department Rights–of–Way Within the City of Houston." Pursuant to this ordinance, the City and the State entered into a "Master Agreement," which provides,

[T]he City has requested the State to permit the construction, maintenance, and operation of public off street parking facilities and to permit other appropriate uses within such city, under all existing and future freeways where long elevated sections exist or will exist[.]

... [T]he State has indicated its willingness to approve the establishment of such parking facilities and other uses ... conditioned that the City will enter into agreements with the State for the purpose of determining the respective responsibilities of the City and the State with reference thereto, and conditioned that such parking and other uses are in the public interest and will not damage the highway facilities, impair safety, impede maintenance or in any way restrict the operation of the highway facility ...

... [T]his agreement is intended to provide that the space beneath the structure may be used for other appropriate purposes in addition to parking and each proposed project shall be approved by supplemental agreement executed between the City of Houston and the State Highway Department ....

GAR notes that the Master Agreement requires the City to pick up trash, mow, and otherwise keep the facility in a clean and sanitary manner and to take further

steps to "eliminate the possible creation of a nuisance or hazard to the public."

GAR further alleges that TXDOT, along with its co-defendants METRO and the City, intentionally blocked or restricted access to the restaurant by fencing in the alley and parking area and that TXDOT's conduct resulted in a taking in violation of article 1, section 17 of the Texas Constitution.[2] GAR also asks for injunctive relief under sections 65.011 and 65.015 of the Texas Civil Practice and Remedies Code.[3]

In its plea to the jurisdiction, TXDOT contends that GAR's suit is barred by sovereign immunity. TXDOT asserts that GAR does not own a real property interest in the alley and parking area and that TXDOT owns the property, has not conveyed an interest to GAR, and has not abandoned the property. TXDOT also asserts that GAR has "no express or implied, public or private easement over and across" the property.

At the trial court's hearing on TXDOT's plea, Patrick Tollett, a representative for GAR's managing agent, testified that construction on 2016 Main began in 1963 and was completed in 1964, GAR owned a number of units in 2016 Main, one of 2016 Main's property lines directly abuts the alley and is adjacent to the Pierce Elevated, and 2016 Main is bounded on its other three sides by Main, Gray, and Travis Streets. 2016 Main has commercial units on the ground floor, including a restaurant space currently leased by GAR to Sammy's. Tollett began working at GAR in 1982, and since 1982 the alley had been used by the public to travel between Travis and Main Streets and to access the parking area. For the last twenty or thirty years, Tollett had observed the public driving back and forth through the alley,

which has sidewalks on both sides and is wide enough to permit traffic to travel simultaneously in opposite directions. Additionally, the alley provided the only access to the parking area. Tollett noted that the restaurant space in 2016 Main has a set of double doors that open directly from the restaurant's kitchen area into the alley and that GAR, GAR's tenants, and GAR's vendors use the alley to make deliveries and remove trash. Tollett explained that Metro blocked access to the alley and parking area when it installed steel posts in the alley's Main Street entrance and later installed fencing around the alley and parking area.

John Deal, a partner in Sammy's, testified that at the time he negotiated the lease with GAR, he was not aware that METRO planned to block access to the alley and there were no signs METRO intended to block the parking area. Deal explained that the kitchen is not functional without the ability to receive deliveries through the alley doors and, as a result, Sammy's is unable to open its restaurant.

In addition to these witnesses, GAR presented documentary evidence, including the deeds for the property on which the alley and the parking area are located. These deeds reflect that in 1959, prior to the commencement of 2016 Main's construction, the State purchased this property for the construction of "Controlled Access Highways." GAR also introduced a copy of an ordinance, passed by the City in 1966, authorizing an agreement between the City, State, and United States Department of Commerce, Bureau of Public Roads, under which the City was authorized to construct, maintain, and operate an off-street public parking facility underneath the Pierce Elevated. The agree-

---

**2.** TEX. CONST. art. I, § 17.

**3.** TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.011, 65.015 (Vernon 1997).

ment, which was entered into by the parties pursuant to this ordinance, provides,

> It is to be understood that the State by execution of this agreement with the City for the use of this area as a parking facility does not impair or relinquish the State's right to use such land for right-of-way purposes when it is required for the construction or reconstruction of the traffic facility for which it was acquired, nor shall use of the land as a parking facility under such agreement ever be construed as abandonment by the State of such land acquired for highway purposes.

The agreement also provides the State with a right to terminate the use of the area as a parking facility.

The defendants then introduced into evidence a copy of a 2005 lease agreement executed between the State, acting through TXDOT, and METRO, pursuant to section 202.052 of the Texas Transportation Code.[4] In the agreement, the State leased a two-block area underneath the Pierce Elevated, including the property on which the alley and parking area are located, to METRO "solely for the purpose of ... surface parking lots." It also authorized METRO to "construct improvements consistent with the operation and maintenance of a parking facility," including the installation of upgraded lighting, a seven-foot wrought-iron fence, and vehicular and pedestrian security gates.

After the hearing, GAR filed an amended petition, repeating many of the same factual allegations, and emphasizing that Sammy's entered its lease with GAR with the expectation of unrestricted access to the alley and that the restaurant is not operational without access to the alley to receive deliveries from vendors.[5]

## Plea to the Jurisdiction

■ A plaintiff who sues the State must establish the State's consent to sue. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). The State may assert sovereign immunity from suit in a plea to the jurisdiction. *Id.* A plea to the jurisdiction seeks dismissal of a case for lack of subject-matter jurisdiction. *Id.* at 637. When reviewing a trial court's ruling on a plea to the jurisdiction, we construe the pleadings in favor of the plaintiff. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law that we review de novo. *Id.* Likewise, whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law. *Id.* If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *Id.* at 227. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. If the

---

4. TEX.TRANSP. CODE ANN. § 202.052(a) (Vernon 1999) ("The department may lease a highway asset, part of a right-of-way, or airspace above or underground space below a highway that is a part of the state highway system if the department determines that the interest to be leased will not be needed for a highway purpose during the term of the lease.").

5. In its amended petition, GAR dropped its claims for violation of the Private Real Property Preservation Act, tortious interference, and breach of contract. GAR also is not appealing the trial court's dismissal of its claim for interference with private and public rights under easement, leaving only its claims for inverse condemnation and for violations of the Texas Civil Practice and Remedies Code on appeal.

evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction. *Id.* at 227–28.

## Inverse Condemnation and Injunctive Relief

■ In its first three issues, which GAR discusses together, GAR argues that the trial court erred in granting TXDOT's plea to the jurisdiction because the trial court had subject matter jurisdiction over GAR's "inverse condemnation and related injunctive relief claims," the pleadings and evidence on file did not affirmatively negate the trial court's subject matter jurisdiction, and GAR "presented sufficient pleadings and evidence conclusively showing, or at least raising issues of material disputed fact, that the trial court had jurisdiction over its inverse condemnation claim ... based upon GAR's property right in an easement of access to the subject street or alley as an abutting property owner."

■ Although sovereign immunity generally protects the State from lawsuits for monetary damages, it offers no shield against an inverse condemnation claim brought under article I, section 17 of the Texas Constitution, which waives immunity for the taking, damaging or destruction of property for public use and authorizes compensation for such destruction. *Steele v. City of Houston,* 603 S.W.2d 786, 791 (Tex.1980); *see also Gen. Servs. Com'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 594 (Tex.2001).

Article I, section 17 of the Texas Constitution provides,

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensa-tion shall be first made, or secured by a deposit of money.

TEX. CONST. art. I, § 17.

■ To recover on an inverse condemnation claim, a property owner must establish that (1) the State or other governmental entity intentionally performed certain acts, (2) that resulted in the taking, damaging, or destruction of its property, (3) for public use. *Steele,* 603 S.W.2d at 788–92 (Tex.1980); *Lethu, Inc. v. City of Houston,* 23 S.W.3d 482, 485 (Tex.App.—Houston [1st Dist.] 2000, pet. denied). Whether particular facts are enough to constitute a taking is a question of law. *Little–Tex,* 39 S.W.3d at 598.

■ A direct physical invasion of property is not required under article I, section 17 to entitle an owner to compensation for a taking. *DuPuy v. City of Waco,* 396 S.W.2d 103, 108 (Tex.1965). "[A]n abutting property owner possesses an easement of access which is a property right; ... this easement is not limited to a right of access to the system of public roads; and ... diminishment in the value of property resulting from a loss of access constitutes damage [compensable under article I, section 17 of the Texas Constitution]." *State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996) (citing *DuPuy,* 396 S.W.2d at 108); *see also Lethu, Inc.,* 23 S.W.3d at 485. A landowner with an easement of access is entitled to compensation through an inverse condemnation claim whenever the access is "materially and substantially impaired." *Heal,* 917 S.W.2d at 10 (citing *City of Waco v. Texland Corp.,* 446 S.W.2d 1, 2 (Tex.1969)); *see also DuPuy,* 396 S.W.2d at 110 (stating that construction of viaduct, which deprived landowner of "reasonable access," entitled him to compensation under the constitution).

Here, the relevant jurisdictional facts are largely undisputed. The parties' central dispute concerns whether GAR has an

actionable vested property interest, i.e., an easement of access through the alley and over the State's property. *See City of Houston v. Northwood Mun. Util. Dist. No. 1,* 73 S.W.3d 304, 311 (Tex.App.—Houston [1st Dist.] 2001, pet. denied) ("[A] plaintiff asserting a claim under article I, section 17 must show that it has a 'vested' property interest."); *Carson v. State,* 117 S.W.3d 63, 68 (Tex.App.—Austin 2003, no pet.) (recognizing that plaintiff must have "vested legal right" of access and not merely historical permissive use to have actionable inverse condemnation claim). GAR asserts that it "has a vested property right in the public alley." TXDOT asserts that GAR does not possess an easement of access and that the "driveway" was not a "public road or alley." TXDOT further asserts that "there was no dedication of the State's property as a public road" and that GAR's "temporary permissive use of the property" did not "result in a dedication."

▮▮▮▮▮ "[A]butting property owners have private rights in existing streets and alleys in addition to their rights in common with the general public." *City of San Antonio v. Olivares,* 505 S.W.2d 526, 530 (Tex.1974); *see also State v. Meyer,* 403 S.W.2d 366, 370 (Tex.1966) (recognizing that "abutting property owners have certain private rights in existing streets and highways in addition to their right in common with the general public to use them"). "This right is in effect a private right of ingress and egress" and "[i]s a right of passageway to and from the property." *Olivares,* 505 S.W.2d at 530. This private easement survives the vacation or abandonment of the street. *Id.*

In *Olivares,* the Texas Supreme Court stated that "conveyance of land by reference to a map or plat, upon which lots and streets are laid out, results in the purchaser or one holding under him, acquiring by implication a private easement in the alleys or streets shown on the plat." *Id.; see also Town of Palm Valley v. Johnson,* 17 S.W.3d 281, 288 (Tex.App.—Corpus Christi 2000, pet. denied) ("A private easement in a street may be acquired either as a purchaser in a subdivision with reference to a recorded plat or map ... *or* as an abutting property owner."). A right of an easement of access has been explained as follows:

It is well settled that if one owning land, exhibit a map of it, on which a street is defined, though not as yet opened, and building lots be sold by him, with reference to a front or rear on that street, this operates as an immediate dedication of the street; and the purchasers of lots have a right to have the street thrown open forever. The individual purchasers thereunder acquire an easement in the land designated as an alley or street, and such alley or street becomes charged with the servitude incident to such easement. Such purchasers have, by virtue of the easement thus acquired, the right to have such street or alley kept open, whether the public has or not accepted the dedication by some acts of user. The right acquired by the purchaser is a private easement over those areas set aside and designated as public ways, and this right attaches immediately upon his purchase of the property. Therefore, when the plaintiffs purchased their lots with reference to the subdivision plat, they immediately acquired private rights of easement over the streets shown on such plat as abutting their land whether or not such streets were ever accepted or opened by the City, as representative of the public.

*Dykes v. City of Houston,* 406 S.W.2d 176, 181 (Tex.1966) (internal citations omitted).

The evidence and pleadings on file in this case establish that the State acquired the property at issue in 1959 for the purpose of constructing a controlled access highway, the construction of 2016 Main was commenced in 1963 and completed in 1964, and 2016 Main was constructed so that one of its property lines directly abuts the State's property. The evidence also establishes that in 1966 the State entered into an agreement with the City permitting the construction of a parking area on the State's land under the Pierce Elevated, this agreement provided that the State was not abandoning this land and had a right to terminate the agreement, and in 2005 the State entered into a lease authorizing METRO to use the land for parking and to construct improvements, including the installation of a fence and security gates.

 When the State acquired the land on which the alley and parking area are located, it did so for the express purpose of constructing a controlled access highway, which it did when it constructed the Pierce Elevated. Accordingly, it is presumed that the State, which acquired the property in 1959, unrestricted by any easements or competing property interests, would exercise its rights and use the property to the fullest extent, including the right to exclude others from using the property. *See City of Corpus Christi v. Polasek*, 404 S.W.2d 826, 831–32 (Tex.App.—Corpus Christi 1966, no writ). This presumption is based on the fact that "a condemning authority cannot condemn property and pay less than the full value of it under the guise that its rights will not be exercised to the fullest extent and that the former owner will be permitted to make some use of it." *Id.* at 832.

As the unrestricted property owner, the State then acted within its rights to enter into the lease agreement with the City

permitting it to use the space below and bordering the Pierce Elevated as a public parking area. But the State, in entering into this agreement, expressly stated that it was not abandoning its property interest. Although the public, including GAR, appears to have enjoyed the use of the parking area and alley constructed pursuant to the City's lease, the State has now leased its property to METRO for METRO's exclusive use. *Id.* The State, acting as the unrestricted property owner, subsequently acted within its rights when it granted METRO the exclusive use of its property, exercising the right of termination it reserved in its agreement with the City and terminating what can only be described as GAR's and the public's prior "temporary permissive use." *See id.; see also Carson*, 117 S.W.3d at 68 (stating that "[a] party cannot gain a legal right to property against the State by adverse possession"). Here, we are not presented with the situation where "an owner's former right of access to a public facility, appurtenant to his remainder, is being retained in his favor." *Polasek*, 404 S.W.2d at 832.

Moreover, this case is distinguishable from those cited by GAR in support of its arguments. For example, in *City of Houston v. Hughes*, the plaintiffs brought suit against the City of Houston seeking to recover title to a strip of land that the plaintiffs conceded had been used as a road to access lots previously sold by the plaintiffs to a number of other parties. 284 S.W.2d 249, 252 (Tex.Civ.App.—Austin 1955, writ ref'd n.r.e.). In concluding that the road was public, the court stated,

> The principle upon which the binding and irrevocable nature of a dedication rests, appears to be this: that when once a way, street, etc., has been laid out on the soil, or on a map, and property has been purchased in reference thereto,

the resumption of the street, or way, by the proprietor, would be an act of bad faith, and a fraud upon any interests acquired upon the faith of its being left open. Hence, it operates as an estoppel in pais of the owner, from exclusive use of the property, or indeed any use, which is inconsistent with the public use, to which it has been dedicated.

*Id.* (citing *Oswald v. Grenet*, 22 Tex. 94, 102 (Tex.1858)).[6]

In *Quanah Acme & P. Ry. Co. v. Swearingen*, a landowner whose property abutted an alley brought suit against a railroad that installed a rail platform across the alley, impairing the landowner's access to his property. 4 S.W.2d 136, 138 (Tex.Civ. App.—Amarillo 1927, writ ref'd). Although the court stated that "[a] way over land set apart for public travel in a town or city is a street, no matter what it may be called," and that "[a] narrow way, less in size than a street, is generally called an alley; and, if the alley is a public one, it is a highway, and in general, is governed by the rules applicable to streets," it was undisputed that "the alley had been dedicated to public use." *Id.* at 138.

In contrast, although the alley in this case "has sidewalks, double lanes, and continues on parallel to the Pierce Elevated for at least several blocks" and although there were parking meters in the parking area at one time, the State did not dedicate its land or the alley and parking area located under and around the Pierce Elevated to become a public alley in the sense that it would entitle abutting owners to claim a compensable easement of access through the alley. When it entered into the lease with the City and permitted the construction of the alley and parking area, the State did not dedicate its land to serve as a public road or alley and forfeit its unrestricted right to its property. In fact, the evidence is clear regarding the purposes for which the State acquired the land—the erection of a controlled access highway. The evidence is also clear that TXDOT never intended to dedicate the property for use as a public street. The lease established that, by entering into the agreement, the State was not abandoning its interest and that the State had a right to terminate the agreement—a right it exercised when it entered into the new lease with METRO.[7] We hold that the evidence and pleadings on file conclusively establish, as a matter of law, that GAR does not have a vested legal right to access the alley and parking area. Accordingly, we further hold that the trial court did not have subject matter jurisdiction over GAR's "inverse condemnation and related injunctive relief claims" and that the trial court did not err in granting TXDOT's plea to the jurisdiction. We overrule GAR's first, second, and third issues.

---

**6.** The issue of implied dedication frequently arises in the determination of whether or not a road, which was formerly considered a private road, has been dedicated for public use. *See Gutierrez v. County of Zapata*, 951 S.W.2d 831, 837–38 (Tex.App.—San Antonio 1997, no writ) (stating that dedication) "may be accomplished by either an express grant or by implication" and that implied dedication requires "a clear and unequivocal intention on the part of the landowner to appropriate the land to public use." The court in *Gutierrez* noted that "[t]he theory of implied dedication finds its basis in the doctrine of equitable estoppel." *Id.* at 838 n. 6. However, as noted above, "[i]t is well settled under Texas law that adverse possession, estoppel, and laches do not run against the state." *Sorsby v. State*, 624 S.W.2d 227, 236 (Tex.Civ.App.—Houston 1981, no writ).

**7.** To the extent that GAR would have claimed a right to access the controlled access highway, such a claim would have failed. *See* TEX. TRANSP. CODE ANN. § 203.034 (Vernon 1999) ("An owner of real property adjoining a new controlled access highway location is not entitled to access to the new highway location as a matter of right.").

**Claims Against Other Governmental Entities**

In its fourth issue, GAR argues that the trial court erred in granting the plea because "the trial court had jurisdiction over other claims against governmental entities in addition to the inverse condemnation claim against [the State]." In support of its fourth issue, GAR cites, inter alia, *Harris County Flood Control Dist. v. PG & E Tex. Pipeline, L.P.,* 35 S.W.3d 772, 773 (Tex.App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.), *disavowed on other grounds by City of Houston v. Northwood Mun. Util. Dist. No. 1,* 74 S.W.3d 183 (Tex.App.—Houston [1st Dist.] 2002, no pet.).

However, the Texas Supreme Court has recently held that "it is proper for a trial court to dismiss claims over which it does not have subject matter jurisdiction but retain claims in the same case over which it has jurisdiction". *Thomas v. Long,* 207 S.W.3d 334, 338 (Tex.2006). The court further stated that "[a] trial court is not required to deny an otherwise meritorious plea to the jurisdiction or a motion for summary judgment based on a jurisdictional challenge concerning some claims because the trial court has jurisdiction over other claims." *Id.* The court specifically disapproved of *PG & E Tex. Pipeline, L.P.,* 35 S.W.3d at 773, to the extent it held otherwise. *Id.* Accordingly, we hold that the trial court did not err in granting the plea on the ground that it had jurisdiction over GAR's other claims against other governmental entities.

We overrule GAR's fourth issue.

### Conclusion

We affirm the order of the trial court.