TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00052-CV






The State of Texas, Appellant


v.


Harrell Ranch, Ltd. and KGB Partnership, Ltd., Appellees






FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY

NO. C-1-CV-05-002623, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING





O P I N I O N


 This appeal arises from a condemnation proceeding in which the State of Texas
acquired 173.712 acres of land and a .087-acre drainage easement from Harrell Ranch, Ltd. for the
construction of a state highway. The condemnation proceeding involved not only the determination
of the value of the land taken and the resulting diminution in value of the remainder property,
but also Harrell Ranch's counterclaim for lost profits from its cattle ranch business due to a
temporary impairment of access to its remainder property. The State appeals Harrell Ranch's
recovery of lost profits, arguing that (1) there was no material and substantial impairment of access,
(2) Harrell Ranch's claim for lost profits was inconsistent with its position in determining the
post-taking value of the remainder property that the property had lost its suitability for a cattle ranch
business, and (3) Harrell Ranch's evidence of lost profits did not include necessary deductions
for expenses. The State also complains that there was insufficient evidence to support the
trial court's judgment on the diminution in value of the remainder property. We affirm the judgment
of the trial court.


Factual and Procedural Background

 This is a condemnation proceeding initiated by the State of Texas. The subject
property, a 290.374-acre rectangular piece of land stretching from north to south, was eastern
Travis County ranch land owned in fee simple by Harrell Ranch, Ltd. The property's southern
boundary abutted FM 969, and a northern portion of the property extended to the east and abutted
Gilbert Lane, an unpaved road.

 The State acquired 173.712 acres of the Harrell Ranch property by condemnation for
the construction of State Highway 130. (1) The condemned portion ran north to south through the
Harrell Ranch property, leaving 116.662 acres divided into nine remainder tracts of land. (2) The
remainder tracts on the east side of SH 130, from south to north, are: Tract 1, an 8.365-acre tract
immediately to the north of FM 969; Tract 2, a 5.154-acre tract contiguous to Tract 1; Tract 3, a
7.879-acre tract contiguous to Tract 2; Tract 4, the largest tract, consisting of 46.792 acres
and abutting Gilbert Lane to the east, but separated from all other remainder tracts; and Tract 5, a
1.251-acre triangular tract separated from all other remainder tracts. The remainder tracts on the
west side of SH 130, from north to south, are: Tract 6, a 15.585-acre tract separated from all other
remainder tracts; Tract 7, a 1.068-acre triangular tract separated from all other remainder tracts;
Tract 8, a 13.820-acre tract contiguous to Tract 9; and Tract 9, a 16.748-acre tract immediately to
the north of FM 969.

 On June 24, 2005, the special commissioners awarded Harrell Ranch $2,107,650 for
the condemnation. The State deposited this amount on July 14, 2005, to take possession of
the condemned portion of the Harrell Ranch property. Harrell Ranch timely objected to the special
commissioners' award and, subsequently, filed a counterclaim for inverse condemnation (3) alleging
denial of access to the remainder tracts.

 At the trial, the parties' experts' valuations of the Harrell Ranch property differed
significantly, with the two experts for Harrell Ranch providing values of $7,305,554 and $7,700,000,
and the State's expert valuing the property at $2,890,080. The primary reason for this disparity was
particulars having to do with the nature of Harrell Ranch's use of its property.

 Harrell Ranch purchased the property in order to produce specialty beef cattle. 
According to Samuel Harrell and Howard Kay, owners of Harrell Ranch, the land was selected
primarily because of a topsoil that would support high-protein grasses, available groundwater low
in nitrate, and proximity to a major airport to fly in potential clients. Harrell Ranch spent $961,000
on improving the pastures with irrigation systems and high-protein grasses, and over $300,000 for
the necessary buildings. In order to produce beef with a low amount of saturated fat and a high
degree of marbling, Harrell Ranch cross-bred Japanese Wagyu bulls with Angus cows. The property
itself was certified as organic by the Texas Department of Agriculture, which certification requires
the land to be kept free from prohibited materials for at least three years. Harrell Ranch also
obtained "NHTC" certification by the U.S. Department of Agriculture, which is necessary for
shipment to the European Union and required, according to Harrell's testimony, that the cattle spend
their entire lives on the Harrell Ranch property. Neither the organic certification nor the NHTC
certification could be transferred to another property. The beef from the Harrell Ranch cattle was
sold to high-end restaurants and hotels in Japan, Europe, and the United States, commanding prices
above $3,000 per carcass rather than a price below $1,000 for regular cattle, according to Harrell. 
The initial purchase of land occurred in 1993, the first harvest was in 1999, the certifications were
obtained in 2001, and Harrell Ranch harvested close to 600 head of cattle in 2003. The property
maintained 1,130 head of cattle at one point.

 In addition to its objection to the special commissioners' award for the taking of land,
Harrell Ranch sought lost profits resulting from the State's denial of access to the remainder property
commencing on the date of the taking. The court held a pre-trial hearing regarding Harrell Ranch's
allegation of denial of access. (4) The State's petition for condemnation granted access to all remainder
tracts from the "service/access road" of SH 130. However, Harrell Ranch argued that such service
road did not yet exist and that the haul road, which was completed in August 2005 for construction
purposes and would eventually become the service road, was unsafe due to the State's construction
vehicles and did not provide reasonable access. Harrell Ranch also argued that it had no access to
FM 969 because the condemned property included a narrow strip of land separating Tract 9 from the
road and a narrow strip of land separating Tract 1 from the road. The trial court held that there was a
"total and temporary denial of legal access" to each of the tracts except for Tract 4, which,
Harrell Ranch conceded, had access to Gilbert Lane. The trial court then held, alternatively, that
there was a "material and substantial impairment of physical access" to the same tracts, except for
Tracts 8 and 9 because the court concluded that Harrell Ranch could physically access those tracts
from FM 969 by a driveway that existed prior to the taking.

 At trial, Harrell Ranch submitted evidence that because of its lack of access to the
property, 408 of the 432 head of cattle remaining on the property were removed and sold at
liquidation prices between July 14 and August 4, 2005, resulting in a loss of $1,467,488. Regarding
the 173.712 acres taken, Harrell Ranch's experts presented values of $4,458,256 and $4,100,044,
whereas the State's expert testified to a value of $1,328,589. For the diminution in the value of the
remainder, Harrell Ranch's experts testified to $2,816,820 and $2,661,934, and the State's expert
testified to a diminution of $861,415. The jury found that Harrell Ranch was entitled to $2,312,026
for the property taken, $3,178,983.40 for the remainder property, and $1,467,488 in lost profits from
the denial of access. The trial court rendered judgment on the verdict.

 The State appeals the award of lost profits and the award for the diminution in value
of the remainder. Regarding the award of lost profits, the State argues that (1) there was no denial
of access, (2) because Harrell Ranch's appraisals of the diminution in value of the remainder
included the property's loss of certifications and utility as a cattle ranch on the date of taking, no lost
profits should have been available, and (3) Harrell Ranch failed to deduct expenses in its calculation
of lost profits. Regarding the award for the remainder's diminution in value, the State argues that
the amount is outside the range of value evidence presented at trial and is, therefore, not supported
by the evidence.


Denial of Access

 As a general rule, lost profits are not available in an eminent domain proceeding. See
State v. Sungrowth VI, Cal., Ltd., 713 S.W.2d 175, 177 (Tex. App.--Austin 1986, writ ref'd n.r.e.). 
Evidence of lost profits may be admitted not as a separate item of damages, but as it bears upon the
value of the land taken or the diminution in value of the remainder. See id. The exception to this
rule is where there is a "material and substantial interference" with access to the property
consisting of a total temporary restriction of access, a partial permanent restriction of access, or
a temporary restriction of access resulting from illegal or negligent activity. City of Austin
v. Avenue Corp., 704 S.W.2d 11, 13 (Tex. 1986). But see AVM-HOU, Ltd. v. Capital Metro. Transp.
Auth., No. 03-07-00566-CV (Tex. App.--Austin Aug. 29, 2008, no pet. h.) (lost profits not
compensable if there is a total taking leaving no remainder). The trial court found that Harrell Ranch
had suffered a total temporary restriction of access to its remainder property.

 Whether there has been a material and substantial impairment of access is a question
of law. State v. Heal, 917 S.W.2d 6, 9 (Tex. 1996). Consequently, a trial court's determination
regarding a total temporary restriction of access is subject to de novo review. See County of Bexar
v. Santikos, 144 S.W.3d 455, 459 (Tex. 2004). We will uphold the trial court's conclusions of law
if the judgment can be sustained on any legal theory supported by the evidence, and we will
reverse only if the conclusions of law are erroneous as a matter of law. Texas Dep't of Pub. Safety
v. Stockton, 53 S.W.3d 421, 423 (Tex. App.--San Antonio 2001, pet. denied). The trial court
determined as a matter of law that Harrell Ranch suffered a total and temporary denial of access to
its remainder property (other than Tract 4) from the date of taking. On appeal, the State argues that
such finding is erroneous as a matter of law.

 Tract 4, with its access to Gilbert Lane to the east, was not at issue. The only
rights-of-way that might have been accessible by the other eight remainder tracts are FM 969 to the
south and SH 130, the highway under construction. We first look at access to FM 969.

 The State's taking included a strip of land separating Tract 9 (on the west side of
SH 130) from FM 969 and a strip of land separating Tract 1 (on the east side of SH 130) from
FM 969. Tract 8 is contiguous to Tract 9 on the north, and Tracts 2 and 3 are contiguous to Tract 1
on the north. The State argues that by using existing driveways on FM 969, Harrell Ranch had
access to Tracts 1, 2, 3, 8, and 9. However, Harrell Ranch argues that it had no right of access,
regardless of whether existing driveways made access physically possible.

 Owners of property abutting a street or highway generally have a right of access
thereto. City of Beaumont v. Marks, 443 S.W.2d 253, 255-56 (Tex. 1969). But see State v. Meyer,
403 S.W.2d 366, 372 n.1 (Tex. 1966) (noting that a different rule applies with regard to a
controlled-access highway). In this case, the State's taking of strips of land parallel to FM 969
caused Harrell Ranch to cease being an abutting property owner. See State v. Fuller, 407 S.W.2d
215, 220-21 (Tex. 1966) (until intervening strip of land was used in widening the highway, property
owners did not own land abutting on the highway and had no right of access thereto); Municipal Inv.
Corp. v. Triplett, 371 S.W.2d 124, 126 (Tex. Civ. App.--Amarillo 1963, writ ref'd n.r.e.)
(property did not abut roadway due to an intervening vacant strip of land, even though property
owner used the strip of land for ingress and egress to the roadway). Harrell Ranch's mere proximity
to FM 969 did not establish a right of access to it.

 Nor did the State's petition for condemnation provide for Harrell Ranch's right of
access to FM 969. This Court's decision in Carson v. State provides guidance with respect to the
implications of this omission. 117 S.W.3d 63 (Tex. App.--Austin 2003, no pet.). In Carson, the
property at issue, in addition to bordering on a highway frontage road to the east, had bordered on
a public road to the north until the State condemned a strip of land separating the property from the
road in 1957. See id. at 65. For over forty years thereafter, the property owner continued to use a
driveway on the north to access his property. In 2000, the property owner learned that the driveway
would be removed with no remaining access to the northern road, and he sued for loss of value to
the property for the taking of his "access right." See id. at 65-66. This Court rejected the
property owner's claim for compensation, holding that because the State had taken the strip of land
in fee simple and did not reserve any access rights to the remainder tract, the driveway's removal did
not deprive the property owner of any right. See id. at 68-69. With no right to access the northern
road reserved in the condemnation proceeding or maintained as an abutting landowner, the property
owner could not rely on or enforce his continued access. In valuing the remainder property
after a taking, "[t]he presumption is that the State will exercise its rights and use and enjoy
the property taken to the full legal extent." Creighton v. State, 366 S.W.2d 840, 843
(Tex. Civ. App.--Eastland 1963, writ ref'd n.r.e.).

 Furthermore, there is no evidence that the State entered into any formal agreement
with Harrell Ranch to provide access to FM 969 between the date of taking and the completion of
SH 130. The State presented evidence of its policy to enable access for adjacent property owners
during construction, and there was also some evidence that the State would allow such access
specifically for Harrell Ranch. However, this evidence does not alter or undermine the State's ability
to have denied such access at any time it so desired. (5) See GAR Assocs. III v. State, 224 S.W.3d 395,
403 (Tex. App.--Houston [1st Dist.] 2006, no pet.) (property owner's use of parking lot, under
State's lease agreement with city for such use, was "temporary permissive use" that could not be
enforced when the State terminated the lease); State v. Frost, 456 S.W.2d 245, 254-55
(Tex. Civ. App.--Houston [14th Dist.] 1970, writ ref'd n.r.e.) (promissory statements of landowner's
permitted access can be revoked at the pleasure of the condemnor); City of Corpus Christi
v. Polasek, 404 S.W.2d 826, 831-32 (Tex. Civ. App.--Corpus Christi 1966, no writ) ("At most, a
temporary permissive use is shown, and that is subject to appellant's legal right to change it in the
future."); Creighton, 366 S.W.2d at 843 (for diminution of remainder's value, State could not present
testimony on permitted uses during construction because such "testimony was not relative to a right
granted appellants but to a privilege which might be granted, refused, or, if granted, revoked at the
pleasure of appellee"). Because Harrell Ranch was not an abutting property owner to FM 969 and
had no access thereto granted by the condemnation petition or by any other enforceable agreement,
Harrell Ranch had no right of access to FM 969.

 The fact that Harrell Ranch had no right of access, even though the physical act of
access may have still been possible, is relevant because of how Harrell Ranch chose to show its lost
profits. Rather than continuing to run its cattle business with no legally enforceable assurance that
its access to do so by way of FM 969 would be maintained, Harrell Ranch sold off 408 head of cattle
at liquidation prices. If Harrell Ranch had not done so, and the State exercised its right to block
Harrell Ranch's access to FM 969, Harrell Ranch's inability to bring feed and water onto its
property or to move its cattle off the property could well have resulted in greater damages. 
Thus, Harrell Ranch's decision to sell off its cattle was reasonable mitigation of damages. See
City of San Antonio v. Guidry, 801 S.W.2d 142, 151 (Tex. App.--San Antonio 1990, no writ)
("The mitigation doctrine requires that an injured party exercise reasonable care to minimize his
damages."). We decline to hold that in these circumstances Harrell Ranch was required to wait for
an actual denial or restriction of access, which the State could do at any time, before it sought to
mitigate its damages from the loss of its right of access.

 We must now consider SH 130, for the loss of a right to access FM 969 would not
be compensable if the remainders could be reasonably accessed via SH 130. See State v. Wood Oil
Distrib., Inc., 751 S.W.2d 863, 865 (Tex. 1988) ("It is well settled that damages to a condemnee's
business which result merely from traffic being required to travel a more circuitous route to reach
a condemnee's property are not compensable."). The State's petition for condemnation expressly
permitted access to the SH 130 "service/access road" from all nine remainder tracts. However,
the State acknowledged that the haul road, which would eventually become the service road by
which Harrell Ranch would be able to access its remainder tracts, was not established until
October 21, 2005. Therefore, from the date of taking to the date the last of the 408 head of cattle was
sold in mitigation of damages, SH 130 did not provide access to the remainder property. (6)

 Because Harrell Ranch had no right of access to FM 969 and no existing access via
SH 130 from July 14 to October 21, 2005, we agree with the trial court that there was a total
temporary restriction of access during that time period constituting a material and substantial
impairment. Lost profits caused by such impairment of access to remainder property are
compensable.


Entitlement to Lost Profits

 The State also argues that, even if there were a material and substantial impairment
of access, Harrell Ranch cannot receive an award for lost profits from the impairment of access
because only a temporary interruption of business is compensable and a discontinued business cannot
be interrupted. See Hart Bros. v. Dallas County, 279 S.W. 1111, 1112 (Tex. Comm'n App. 1926,
judgm't adopted) (recognizing right to damages for temporary interference with an established
business for a definite time). We decline to hold that a business that ceases during an impairment
of access must re-open upon the reinstatement of access in order to recover lost profits during the
time of the impairment. To so hold could punish a business whose impairment of access was severe
enough to destroy the business entirely. Rather, we think the relevant issue is whether the business
would have continued during the period for which lost profits are sought--but for the impairment
of access. See Huckabee v. State, 431 S.W.2d 927, 930 (Tex. Civ. App.--Beaumont 1968, writ ref'd
n.r.e.) (where remainder property after taking was too small to operate the existing business,
there was no temporary loss of business due to blockage of access that would entitle the landowner
to lost profits).

 The State argues that Harrell Ranch's own evidence precludes its position that it
would have continued its specialty cattle ranch business during the time of the impairment of access. 
Harrell Ranch's expert witnesses incorporated into their post-taking valuations of the remainder
portions of the Harrell Ranch property both the loss of the property's certifications and the
demolition of the site improvements built for a specialty cattle ranch. Yet, in calculating lost profits
for the impairment of access commencing on the date of taking, Harrell Ranch sought to recover the
reduction in market value of the cattle as if they could have remained certified and continued to be
raised on the property. The State considers this a contradiction and argues that Harrell Ranch cannot
have it both ways.

 The State's argument overlooks the differing considerations between an award for
diminution in value of remainder property after a taking and an award for lost profits from a denial
of access. Compensation for a taking's damage to a remainder tract is measured by valuing the land
immediately before and immediately after the taking. Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623,
627 (Tex. 2002). However, the valuation after the taking must take into account the State's
construction or other intended use of the taken land. See City of Pearland v. Alexander, 483 S.W.2d
244, 247 (Tex. 1972). This is because a willing buyer of the remainder property would presumably
adjust its price based on the impact of the project under construction. See id.; see also
Spindor v. Lo-Vaca Gathering Co., 529 S.W.2d 63, 65-66 (Tex. 1975) (reasonably foreseeable
damages to a remainder tract resulting from use of taken property are relevant to the determination
of the fair market value of the remainder tract). Harrell Ranch's evidence for the remainder's loss
of its specialty use included the sizes, shapes, and isolation of the remainder tracts, the uncertainty
of suitable access from SH 130, and the loss of water wells. Each testifying expert agreed that the
property's post-taking highest and best use was for residential development, not a cattle ranch. 
While a determination of a property's value can take into account foreseeable events, a determination
of a business's expected profits during a time period need not look beyond that time period. Thus,
an immediate loss of marketability does not necessarily translate to an immediate loss of utility. In
other words, that a willing buyer would not purchase any or all of the remainder tracts to operate a
specialty cattle ranch does not foreclose Harrell Ranch's ability to finish out its currently operating
specialty cattle ranch on the property. Harrell Ranch's attempt to raise its remaining calves was
consistent with a winding down of business. A temporary interruption of business can harm a
business that is winding down just as it can harm an ongoing business.

 We conclude that regardless of the property's loss of marketability as an organic cattle
ranch, Harrell Ranch was entitled to recover its lost profits from the winding down of its cattle
business that were caused by the loss of access to the ranch.


Calculation of Lost Profits

 The State seeks reversal of the trial court's award of $1,467,488 in lost profits for
failure to account for expenses incurred. Lost profits must be based not on gross revenues, but on
net profits, which are the difference between a business's total receipts and all the expenses incurred
in carrying on the business. Texaco, Inc. v. Phan, 137 S.W.3d 763, 771 (Tex. App.--Houston
[1st Dist.] 2004, no pet.). There must be some showing that expenses were deducted in arriving at
the amount of net profits lost. See id. at 772.

 The State asserts that any showing of expenses deducted was legally and/or factually
insufficient. In reviewing the State's legal sufficiency challenge, we review the evidence in the light
favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding
contrary evidence unless reasonable jurors could not. City of Keller v. Wilson, 168 S.W.3d 802, 807
(Tex. 2005). We will sustain the State's complaint if the record reveals: (1) the complete absence
of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than
a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. See id.
at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 601 (Tex. 2004). In reviewing the State's factual sufficiency challenge, we must
consider and weigh all the evidence in the record, both supporting and against the finding, to decide
whether the verdict should be set aside. Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). 
We set aside the verdict for factual insufficiency only if the evidence that supports the jury's finding
is so weak as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 Harrell Ranch calculated its lost profits based on the difference between the market
value of the 408 remaining head of cattle, given Harrell Ranch's certified operations and beef
quality, and the amounts actually received in the liquidation sales. The amounts actually received
for the bulls, cows, calves, and yearlings were based on receipts from the sales at the commodity
market. (7) Harrell Ranch's calculation of market value for its bulls was based on prior sales, and for
the cows was based on national averages. For the bulls and cows, therefore, no expenses needed to
be deducted because profits were not based on a future projection, but were based on the animals at
the time of sale, such that any applicable expenses had already been paid.

 According to Samuel Harrell's testimony, the calculation of market value for the
calves and yearlings--$3,001 per head--came from the State's appraiser's report of Harrell Ranch's
price per pound, assuming each calf and yearling reached 1,450 pounds when fed out to 27 months
of age, although, according to Harrell, Harrell Ranch typically received $3,400 per carcass. Harrell
testified that he used the lower figure to be conservative. However, Harrell also testified to an
additional reason for the $3,001 value: he had determined that the required expense to finish out a
head of cattle to 27 months was $363, which amount was covered by the reduction from the typical
price per carcass of $3,400 to the $3,001 value used for lost profits. Consequently, the jury had two
possible amounts from which to deduct applicable expenses. We find it reasonable and not
clearly wrong or unjust for the jury to have accepted the $3,001 figure as consisting of a per-carcass
sales price of $3,400 and a per-carcass deduction for expenses that would have been incurred to
obtain that sales price.

 Because a reasonable juror could conclude that the amount sought for lost profits took
expenses into account, and such a finding is not clearly wrong or unjust, we hold that the evidence
was legally and factually sufficient to support the jury's award of lost profits.


Diminution in Value of the Remainder Property

 In addition to the award of lost profits for impairment of access, the jury awarded
Harrell Ranch $2,312,026 for the 173.712 acres taken by the State and $3,178,983.40 for the
diminution in value of the remaining 116.662 acres. The State argues on appeal that the
$3,178,983.40 award is outside the range of valuation evidence admitted at trial. The standard of
review for an excessive damages complaint is factual sufficiency of the evidence. Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex. 1998). Under this standard, we examine all of
the evidence to determine whether the award is supported by sufficient evidence and order remittitur
only if the award is so against the overwhelming weight of the evidence as to be clearly wrong and
unjust. See id. at 406-07.

 In valuing the loss in value of remainder property in a condemnation case, the
fact finder is not entitled to depart from the range of value admitted as evidence. See State
v. Huffstutler, 871 S.W.2d 955, 959 (Tex. App.--Austin 1994, no writ) ("In a condemnation case,
the jury is allowed to set the value at any amount between the lowest and highest values the
expert witnesses put in evidence."); see also Parallax Corp. v. City of El Paso, 910 S.W.2d
86, 91-92 (Tex. App.--El Paso 1995, writ denied) (jury can depart from expert valuations if
other evidence presented at trial is sufficient for the jury to do so); Pleasant v. Bradford,
No. 03-07-00167-CV, 2008 Tex. App. LEXIS 4821, at *32-33 (Tex. App.--Austin June 26, 2008,
pet. filed) (damages award not arbitrary simply because it does not match up precisely with the
figures presented by expert witnesses). The jury in this case was presented with three different
valuations of the damages to the remainder property. One of Harrell Ranch's expert witnesses, Rudy
Robinson, testified to a $2,816,820 value, and Harrell Ranch's other expert, James Archibald,
testified to a $2,661,934 value. The State's expert witness presented an $861,415 valuation. Each
of these valuations was based on a different methodology and applied differently to the portions of
the property taken and those that remained.

 The jury has discretion to take into account damage amounts that overlap between
multiple categories of damages. See Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 773
(Tex. 2003) ("[I]n reviewing a challenge that an award for a category is excessive because there is
factually insufficient evidence to support it, a court of appeals should consider all the evidence that
bears on that category of damages, even if the evidence also relates to another category of
damages."). In this case, there was disagreement among the expert witnesses on how to account for
the land's NHTC and organic certifications. Robinson valued the certifications at 40% of the
property's value, or $2,200,000, and assigned the entire premium to the taken portion only. 
Archibald valued the certifications as a 10% annual increase for the three years over which the
property became qualified for the certifications, and then divided the total premium between the
taken portion and the remainder portion on a per-acre basis. (8) The State's expert witness, taking the
position that the property's pre-taking highest and best use was for residential development, did not
attribute any certification premium to the property and, thus, did not allocate a premium between the
taken portion and the remainder portion.

 There is nothing in the record to inform us of the jury's reasoning in arriving at its
$3,178,983.40 award for remainder damages. From our review of the evidence, if a certification
premium is included in the calculation, a value in the range of the jury's damages award is obtained. 
Particularly, by using Robinson's valuations, but allocating his $2,200,000 premium by acreage
rather than to the taken portion only, the result is a $3,574,374 value of the part taken (9) and a
$3,700,702 value of the diminution in the remainder. (10) Given these possible applications of the
evidence, the jury award for the diminution in value of the remainder falls within the range of
evidence and is not excessive. See id. at 773-74 (where only one category of damages is contested,
a court of appeals should consider evidence unique to the category and evidence that might overlap
between that category and another). We must, therefore, ask whether the jury would have been
entitled to combine Robinson's valuation of the certification premium and Archibald's method of
allocating the premium.

 We are guided by the Texas Supreme Court's analysis in Callejo v. Brazos Electric
Power Cooperative, Inc. 755 S.W.2d 73 (Tex. 1988). In that case, the court recognized that jurors
"are not bound, as a matter of law, to accept the parties' expert testimony" and yet may not "leap
entirely outside of the evidence in answering any question submitted to them." Id. at 75. Therefore,
the jury in the court below was not bound to simply accept or reject Robinson's certification
allocation method as a whole, and because Archibald testified to allocation by acreage, the jury could
have employed that allocation method without "leaping outside of the evidence." The State
expresses concern that the jury's award might involve the type of blending of expert opinions that
was rejected by the court in Callejo. In Callejo, the jury in a condemnation proceeding had found
a post-taking value of remainder property more than ten times higher than the largest amount
provided by expert testimony. See id. at 74. The court, finding that the jury had blended testimony
on pre-taking value with testimony on post-taking value, rejected the jury's answer on the post-taking valuation. See id. at 75-76. We do not have any confusion here between pre-taking and post-taking values. Furthermore, both Robinson and Archibald calculated the certification premium on
the same basis--a percentage increase on the pre-taking value of the entire Harrell Ranch property. 
Despite basing the certification premium on the entire property's pre-taking value, Robinson
allocated the entire premium only to the taken portion. Nothing about Robinson's method to
determine the amount of the certification premium prohibited the amount from being allocated
equally by acreage, and in fact, the certifications applied equally to every acre on the property. We
conclude that combining Robinson's premium valuation with Archibald's premium allocation
method would not result in an improper blending of expert testimony.

Conclusion

 We conclude that Harrell Ranch had no right of access to its property as of the date
of taking and was entitled to recover lost profits caused by such material and substantial impairment. 
We hold that lost profits are recoverable in an inverse condemnation proceeding whether the
business is intending to be ongoing or winding down at the time of the loss. We also conclude that
the evidence was legally and factually sufficient to support the jury's award of lost profits. Finally,
we conclude that the evidence was factually sufficient to support the jury's award for diminution in
value of the remainder property. We affirm the judgment of the trial court.



 __________________________________________

 G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed: August 29, 2008

APPENDIX

1. The State also took a .087-acre drainage easement on the southeast corner of the property,
for which the trial court awarded an amount of $1,131. The State does not appeal this award.
2. A diagram of the property at issue is attached as an Appendix to this opinion.
3. The claim is denominated "inverse" because the property owner asserts the claim. 
City of Houston v. Texan Land & Cattle Co., 138 S.W.3d 382, 387 (Tex. App.--Houston
[14th Dist.] 2004, no pet.).
4. The determination of whether access was denied, which enables the admission of
evidence regarding lost profits, must be made by the judge before a jury trial begins. See State
v. Wood Oil Distrib., Inc., 751 S.W.2d 863, 865 (Tex. 1988).
5. In 2004, the State informed Harrell Ranch in writing that access to FM 969 would be
denied. The letter did not inform Harrell Ranch when the denial of access would take place.
6. Harrell Ranch also argued to the trial court that because the petition only included a right
of access to the "service/access road" of SH 130, no access to the haul road used for construction
existed until it was finally transformed into a public service/access road. Because the haul road itself
did not yet exist at the time of Harrell Ranch's mitigation of damages, we do not reach this argument.
7. The State does not challenge Harrell Ranch's failure to admit such receipts into evidence. 
See Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992) ("Although supporting
documentation may affect the weight of the evidence, it is not necessary to produce in court the
documents supporting the opinions or estimates.").
8. Thus, under Archibald's assessment, after the three-year waiting period for the
certifications, the $17,500-per-acre value for the entire Harrell Ranch property had become
$23,293 per acre.
9. This $3,574,374 amount is the sum of Robinson's land valuation of $2,258,256
(173.712 acres at $13,000 per acre) and a certification premium of $1,316,118 (the portion of the
$2,200,000 certification premium attributable to the taken portion's acreage).
10. This $3,700,702 amount is the sum of $2,760,726 (the diminution amount according to
Robinson's testimony), $883,882 (the portion of the $2,200,000 certification premium attributable
to the remainder's acreage), and a $56,094 cost to cure. Robinson's $2,760,726 amount consisted
of a pre-taking land valuation of $1,516,606 (116.662 acres at $13,000 per acre), $961,500 for
improved pastures, $675,684 as the depreciated value of site improvements, and an adjustment of
$90,000 made to reflect the sales comparison approach, less a $480,000 post-taking land valuation,
the $1,018 value of the easement taken (which he had already set out as a separate damages award),
and a rounding amount of $2,046 (in calculating the pre-taking valuation of the property, Robinson
rounded one figure up by $138 and another figure down by $2,184).