# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-07-00052-CV

---

**The State of Texas, Appellant**

**v.**

**Harrell Ranch, Ltd. and KGB Partnership, Ltd., Appellees**

---

**FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY**
**NO. C-1-CV-05-002623, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING**

---

## O P I N I O N

This appeal arises from a condemnation proceeding in which the State of Texas acquired 173.712 acres of land and a .087-acre drainage easement from Harrell Ranch, Ltd. for the construction of a state highway. The condemnation proceeding involved not only the determination of the value of the land taken and the resulting diminution in value of the remainder property, but also Harrell Ranch's counterclaim for lost profits from its cattle ranch business due to a temporary impairment of access to its remainder property. The State appeals Harrell Ranch's recovery of lost profits, arguing that (1) there was no material and substantial impairment of access, (2) Harrell Ranch's claim for lost profits was inconsistent with its position in determining the post-taking value of the remainder property that the property had lost its suitability for a cattle ranch business, and (3) Harrell Ranch's evidence of lost profits did not include necessary deductions for expenses. The State also complains that there was insufficient evidence to support the

trial court's judgment on the diminution in value of the remainder property. We affirm the judgment of the trial court.

***Factual and Procedural Background***

This is a condemnation proceeding initiated by the State of Texas. The subject property, a 290.374-acre rectangular piece of land stretching from north to south, was eastern Travis County ranch land owned in fee simple by Harrell Ranch, Ltd. The property's southern boundary abutted FM 969, and a northern portion of the property extended to the east and abutted Gilbert Lane, an unpaved road.

The State acquired 173.712 acres of the Harrell Ranch property by condemnation for the construction of State Highway 130.[1] The condemned portion ran north to south through the Harrell Ranch property, leaving 116.662 acres divided into nine remainder tracts of land.[2] The remainder tracts on the east side of SH 130, from south to north, are: Tract 1, an 8.365-acre tract immediately to the north of FM 969; Tract 2, a 5.154-acre tract contiguous to Tract 1; Tract 3, a 7.879-acre tract contiguous to Tract 2; Tract 4, the largest tract, consisting of 46.792 acres and abutting Gilbert Lane to the east, but separated from all other remainder tracts; and Tract 5, a 1.251-acre triangular tract separated from all other remainder tracts. The remainder tracts on the west side of SH 130, from north to south, are: Tract 6, a 15.585-acre tract separated from all other remainder tracts; Tract 7, a 1.068-acre triangular tract separated from all other remainder tracts;

_____

[1] The State also took a .087-acre drainage easement on the southeast corner of the property, for which the trial court awarded an amount of $1,131. The State does not appeal this award.

[2] A diagram of the property at issue is attached as an Appendix to this opinion.

Tract 8, a 13.820-acre tract contiguous to Tract 9; and Tract 9, a 16.748-acre tract immediately to the north of FM 969.

On June 24, 2005, the special commissioners awarded Harrell Ranch $2,107,650 for the condemnation. The State deposited this amount on July 14, 2005, to take possession of the condemned portion of the Harrell Ranch property. Harrell Ranch timely objected to the special commissioners' award and, subsequently, filed a counterclaim for inverse condemnation[3] alleging denial of access to the remainder tracts.

At the trial, the parties' experts' valuations of the Harrell Ranch property differed significantly, with the two experts for Harrell Ranch providing values of $7,305,554 and $7,700,000, and the State's expert valuing the property at $2,890,080. The primary reason for this disparity was particulars having to do with the nature of Harrell Ranch's use of its property.

Harrell Ranch purchased the property in order to produce specialty beef cattle. According to Samuel Harrell and Howard Kay, owners of Harrell Ranch, the land was selected primarily because of a topsoil that would support high-protein grasses, available groundwater low in nitrate, and proximity to a major airport to fly in potential clients. Harrell Ranch spent $961,000 on improving the pastures with irrigation systems and high-protein grasses, and over $300,000 for the necessary buildings. In order to produce beef with a low amount of saturated fat and a high degree of marbling, Harrell Ranch cross-bred Japanese Wagyu bulls with Angus cows. The property itself was certified as organic by the Texas Department of Agriculture, which certification requires

---

[3] The claim is denominated "inverse" because the property owner asserts the claim. *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 387 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

the land to be kept free from prohibited materials for at least three years. Harrell Ranch also obtained "NHTC" certification by the U.S. Department of Agriculture, which is necessary for shipment to the European Union and required, according to Harrell's testimony, that the cattle spend their entire lives on the Harrell Ranch property. Neither the organic certification nor the NHTC certification could be transferred to another property. The beef from the Harrell Ranch cattle was sold to high-end restaurants and hotels in Japan, Europe, and the United States, commanding prices above $3,000 per carcass rather than a price below $1,000 for regular cattle, according to Harrell. The initial purchase of land occurred in 1993, the first harvest was in 1999, the certifications were obtained in 2001, and Harrell Ranch harvested close to 600 head of cattle in 2003. The property maintained 1,130 head of cattle at one point.

In addition to its objection to the special commissioners' award for the taking of land, Harrell Ranch sought lost profits resulting from the State's denial of access to the remainder property commencing on the date of the taking. The court held a pre-trial hearing regarding Harrell Ranch's allegation of denial of access.[4] The State's petition for condemnation granted access to all remainder tracts from the "service/access road" of SH 130. However, Harrell Ranch argued that such service road did not yet exist and that the haul road, which was completed in August 2005 for construction purposes and would eventually become the service road, was unsafe due to the State's construction vehicles and did not provide reasonable access. Harrell Ranch also argued that it had no access to FM 969 because the condemned property included a narrow strip of land separating Tract 9 from the

---

[4] The determination of whether access was denied, which enables the admission of evidence regarding lost profits, must be made by the judge before a jury trial begins. *See State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988).

4

road and a narrow strip of land separating Tract 1 from the road. The trial court held that there was a "total and temporary denial of legal access" to each of the tracts except for Tract 4, which, Harrell Ranch conceded, had access to Gilbert Lane. The trial court then held, alternatively, that there was a "material and substantial impairment of physical access" to the same tracts, except for Tracts 8 and 9 because the court concluded that Harrell Ranch could physically access those tracts from FM 969 by a driveway that existed prior to the taking.

At trial, Harrell Ranch submitted evidence that because of its lack of access to the property, 408 of the 432 head of cattle remaining on the property were removed and sold at liquidation prices between July 14 and August 4, 2005, resulting in a loss of $1,467,488. Regarding the 173.712 acres taken, Harrell Ranch's experts presented values of $4,458,256 and $4,100,044, whereas the State's expert testified to a value of $1,328,589. For the diminution in the value of the remainder, Harrell Ranch's experts testified to $2,816,820 and $2,661,934, and the State's expert testified to a diminution of $861,415. The jury found that Harrell Ranch was entitled to $2,312,026 for the property taken, $3,178,983.40 for the remainder property, and $1,467,488 in lost profits from the denial of access. The trial court rendered judgment on the verdict.

The State appeals the award of lost profits and the award for the diminution in value of the remainder. Regarding the award of lost profits, the State argues that (1) there was no denial of access, (2) because Harrell Ranch's appraisals of the diminution in value of the remainder included the property's loss of certifications and utility as a cattle ranch on the date of taking, no lost profits should have been available, and (3) Harrell Ranch failed to deduct expenses in its calculation of lost profits. Regarding the award for the remainder's diminution in value, the State argues that

5

the amount is outside the range of value evidence presented at trial and is, therefore, not supported by the evidence.

### *Denial of Access*

As a general rule, lost profits are not available in an eminent domain proceeding. *See State v. Sungrowth VI, Cal., Ltd.*, 713 S.W.2d 175, 177 (Tex. App.—Austin 1986, writ ref'd n.r.e.). Evidence of lost profits may be admitted not as a separate item of damages, but as it bears upon the value of the land taken or the diminution in value of the remainder. *See id.* The exception to this rule is where there is a "material and substantial interference" with access to the property consisting of a total temporary restriction of access, a partial permanent restriction of access, or a temporary restriction of access resulting from illegal or negligent activity. *City of Austin v. Avenue Corp.*, 704 S.W.2d 11, 13 (Tex. 1986). *But see AVM-HOU, Ltd. v. Capital Metro. Transp. Auth.*, No. 03-07-00566-CV (Tex. App.—Austin Aug. 29, 2008, no pet. h.) (lost profits not compensable if there is a total taking leaving no remainder). The trial court found that Harrell Ranch had suffered a total temporary restriction of access to its remainder property.

Whether there has been a material and substantial impairment of access is a question of law. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). Consequently, a trial court's determination regarding a total temporary restriction of access is subject to de novo review. *See County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004). We will uphold the trial court's conclusions of law if the judgment can be sustained on any legal theory supported by the evidence, and we will reverse only if the conclusions of law are erroneous as a matter of law. *Texas Dep't of Pub. Safety v. Stockton*, 53 S.W.3d 421, 423 (Tex. App.—San Antonio 2001, pet. denied). The trial court

determined as a matter of law that Harrell Ranch suffered a total and temporary denial of access to its remainder property (other than Tract 4) from the date of taking. On appeal, the State argues that such finding is erroneous as a matter of law.

Tract 4, with its access to Gilbert Lane to the east, was not at issue. The only rights-of-way that might have been accessible by the other eight remainder tracts are FM 969 to the south and SH 130, the highway under construction. We first look at access to FM 969.

The State's taking included a strip of land separating Tract 9 (on the west side of SH 130) from FM 969 and a strip of land separating Tract 1 (on the east side of SH 130) from FM 969. Tract 8 is contiguous to Tract 9 on the north, and Tracts 2 and 3 are contiguous to Tract 1 on the north. The State argues that by using existing driveways on FM 969, Harrell Ranch had access to Tracts 1, 2, 3, 8, and 9. However, Harrell Ranch argues that it had no *right* of access, regardless of whether existing driveways made access physically possible.

Owners of property abutting a street or highway generally have a right of access thereto. *City of Beaumont v. Marks*, 443 S.W.2d 253, 255-56 (Tex. 1969). *But see State v. Meyer*, 403 S.W.2d 366, 372 n.1 (Tex. 1966) (noting that a different rule applies with regard to a controlled-access highway). In this case, the State's taking of strips of land parallel to FM 969 caused Harrell Ranch to cease being an abutting property owner. *See State v. Fuller*, 407 S.W.2d 215, 220-21 (Tex. 1966) (until intervening strip of land was used in widening the highway, property owners did not own land abutting on the highway and had no right of access thereto); *Municipal Inv. Corp. v. Triplett*, 371 S.W.2d 124, 126 (Tex. Civ. App.—Amarillo 1963, writ ref'd n.r.e.) (property did not abut roadway due to an intervening vacant strip of land, even though property

7

owner used the strip of land for ingress and egress to the roadway). Harrell Ranch's mere proximity to FM 969 did not establish a right of access to it.

Nor did the State's petition for condemnation provide for Harrell Ranch's right of access to FM 969. This Court's decision in *Carson v. State* provides guidance with respect to the implications of this omission. 117 S.W.3d 63 (Tex. App.—Austin 2003, no pet.). In *Carson*, the property at issue, in addition to bordering on a highway frontage road to the east, had bordered on a public road to the north until the State condemned a strip of land separating the property from the road in 1957. *See id.* at 65. For over forty years thereafter, the property owner continued to use a driveway on the north to access his property. In 2000, the property owner learned that the driveway would be removed with no remaining access to the northern road, and he sued for loss of value to the property for the taking of his "access right." *See id.* at 65-66. This Court rejected the property owner's claim for compensation, holding that because the State had taken the strip of land in fee simple and did not reserve any access rights to the remainder tract, the driveway's removal did not deprive the property owner of any right. *See id.* at 68-69. With no right to access the northern road reserved in the condemnation proceeding or maintained as an abutting landowner, the property owner could not rely on or enforce his continued access. In valuing the remainder property after a taking, "[t]he presumption is that the State will exercise its rights and use and enjoy the property taken to the full legal extent." *Creighton v. State*, 366 S.W.2d 840, 843 (Tex. Civ. App.—Eastland 1963, writ ref'd n.r.e.).

Furthermore, there is no evidence that the State entered into any formal agreement with Harrell Ranch to provide access to FM 969 between the date of taking and the completion of

8

SH 130.  The State presented evidence of its policy to enable access for adjacent property owners during construction, and there was also some evidence that the State would allow such access specifically for Harrell Ranch.  However, this evidence does not alter or undermine the State's ability to have denied such access at any time it so desired.[5]  *See GAR Assocs. III v. State*, 224 S.W.3d 395, 403 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (property owner's use of parking lot, under State's lease agreement with city for such use, was "temporary permissive use" that could not be enforced when the State terminated the lease); *State v. Frost*, 456 S.W.2d 245, 254-55 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (promissory statements of landowner's permitted access can be revoked at the pleasure of the condemnor); *City of Corpus Christi v. Polasek*, 404 S.W.2d 826, 831-32 (Tex. Civ. App.—Corpus Christi 1966, no writ) ("At most, a temporary permissive use is shown, and that is subject to appellant's legal right to change it in the future."); *Creighton*, 366 S.W.2d at 843 (for diminution of remainder's value, State could not present testimony on permitted uses during construction because such "testimony was not relative to a right granted appellants but to a privilege which might be granted, refused, or, if granted, revoked at the pleasure of appellee").  Because Harrell Ranch was not an abutting property owner to FM 969 and had no access thereto granted by the condemnation petition or by any other enforceable agreement, Harrell Ranch had no right of access to FM 969.

The fact that Harrell Ranch had no right of access, even though the physical act of access may have still been possible, is relevant because of how Harrell Ranch chose to show its lost

---

[5]  In 2004, the State informed Harrell Ranch in writing that access to FM 969 would be denied.  The letter did not inform Harrell Ranch when the denial of access would take place.

profits. Rather than continuing to run its cattle business with no legally enforceable assurance that its access to do so by way of FM 969 would be maintained, Harrell Ranch sold off 408 head of cattle at liquidation prices. If Harrell Ranch had not done so, and the State exercised its right to block Harrell Ranch's access to FM 969, Harrell Ranch's inability to bring feed and water onto its property or to move its cattle off the property could well have resulted in greater damages. Thus, Harrell Ranch's decision to sell off its cattle was reasonable mitigation of damages. *See City of San Antonio v. Guidry*, 801 S.W.2d 142, 151 (Tex. App.—San Antonio 1990, no writ) ("The mitigation doctrine requires that an injured party exercise reasonable care to minimize his damages."). We decline to hold that in these circumstances Harrell Ranch was required to wait for an actual denial or restriction of access, which the State could do at any time, before it sought to mitigate its damages from the loss of its right of access.

We must now consider SH 130, for the loss of a right to access FM 969 would not be compensable if the remainders could be reasonably accessed via SH 130. *See State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988) ("It is well settled that damages to a condemnee's business which result merely from traffic being required to travel a more circuitous route to reach a condemnee's property are not compensable."). The State's petition for condemnation expressly permitted access to the SH 130 "service/access road" from all nine remainder tracts. However, the State acknowledged that the haul road, which would eventually become the service road by which Harrell Ranch would be able to access its remainder tracts, was not established until

10

October 21, 2005. Therefore, from the date of taking to the date the last of the 408 head of cattle was sold in mitigation of damages, SH 130 did not provide access to the remainder property.[6]

Because Harrell Ranch had no right of access to FM 969 and no existing access via SH 130 from July 14 to October 21, 2005, we agree with the trial court that there was a total temporary restriction of access during that time period constituting a material and substantial impairment. Lost profits caused by such impairment of access to remainder property are compensable.

### Entitlement to Lost Profits

The State also argues that, even if there were a material and substantial impairment of access, Harrell Ranch cannot receive an award for lost profits from the impairment of access because only a temporary interruption of business is compensable and a discontinued business cannot be interrupted. *See Hart Bros. v. Dallas County*, 279 S.W. 1111, 1112 (Tex. Comm'n App. 1926, judgm't adopted) (recognizing right to damages for temporary interference with an established business for a definite time). We decline to hold that a business that ceases during an impairment of access must re-open upon the reinstatement of access in order to recover lost profits during the time of the impairment. To so hold could punish a business whose impairment of access was severe enough to destroy the business entirely. Rather, we think the relevant issue is whether the business would have continued during the period for which lost profits are sought—but for the impairment

---

[6] Harrell Ranch also argued to the trial court that because the petition only included a right of access to the "service/access road" of SH 130, no access to the haul road used for construction existed until it was finally transformed into a public service/access road. Because the haul road itself did not yet exist at the time of Harrell Ranch's mitigation of damages, we do not reach this argument.

11

of access. *See Huckabee v. State*, 431 S.W.2d 927, 930 (Tex. Civ. App.—Beaumont 1968, writ ref'd n.r.e.) (where remainder property after taking was too small to operate the existing business, there was no temporary loss of business due to blockage of access that would entitle the landowner to lost profits).

The State argues that Harrell Ranch's own evidence precludes its position that it would have continued its specialty cattle ranch business during the time of the impairment of access. Harrell Ranch's expert witnesses incorporated into their post-taking valuations of the remainder portions of the Harrell Ranch property both the loss of the property's certifications and the demolition of the site improvements built for a specialty cattle ranch. Yet, in calculating lost profits for the impairment of access commencing on the date of taking, Harrell Ranch sought to recover the reduction in market value of the cattle as if they could have remained certified and continued to be raised on the property. The State considers this a contradiction and argues that Harrell Ranch cannot have it both ways.

The State's argument overlooks the differing considerations between an award for diminution in value of remainder property after a taking and an award for lost profits from a denial of access. Compensation for a taking's damage to a remainder tract is measured by valuing the land immediately before and immediately after the taking. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002). However, the valuation after the taking must take into account the State's construction or other intended use of the taken land. *See City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972). This is because a willing buyer of the remainder property would presumably adjust its price based on the impact of the project under construction. *See id.*; *see also*

*Spindor v. Lo-Vaca Gathering Co.*, 529 S.W.2d 63, 65-66 (Tex. 1975) (reasonably foreseeable damages to a remainder tract resulting from use of taken property are relevant to the determination of the fair market value of the remainder tract).  Harrell Ranch's evidence for the remainder's loss of its specialty use included the sizes, shapes, and isolation of the remainder tracts, the uncertainty of suitable access from SH 130, and the loss of water wells.  Each testifying expert agreed that the property's post-taking highest and best use was for residential development, not a cattle ranch.  While a determination of a property's value can take into account foreseeable events, a determination of a business's expected profits during a time period need not look beyond that time period.  Thus, an immediate loss of marketability does not necessarily translate to an immediate loss of utility.  In other words, that a willing buyer would not purchase any or all of the remainder tracts to operate a specialty cattle ranch does not foreclose Harrell Ranch's ability to finish out its currently operating specialty cattle ranch on the property.  Harrell Ranch's attempt to raise its remaining calves was consistent with a winding down of business.  A temporary interruption of business can harm a business that is winding down just as it can harm an ongoing business.

We conclude that regardless of the property's loss of marketability as an organic cattle ranch, Harrell Ranch was entitled to recover its lost profits from the winding down of its cattle business that were caused by the loss of access to the ranch.

### Calculation of Lost Profits

The State seeks reversal of the trial court's award of $1,467,488 in lost profits for failure to account for expenses incurred.  Lost profits must be based not on gross revenues, but on net profits, which are the difference between a business's total receipts and all the expenses incurred

13

in carrying on the business. *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.). There must be some showing that expenses were deducted in arriving at the amount of net profits lost. *See id.* at 772.

The State asserts that any showing of expenses deducted was legally and/or factually insufficient. In reviewing the State's legal sufficiency challenge, we review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain the State's complaint if the record reveals: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). In reviewing the State's factual sufficiency challenge, we must consider and weigh all the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We set aside the verdict for factual insufficiency only if the evidence that supports the jury's finding is so weak as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Harrell Ranch calculated its lost profits based on the difference between the market value of the 408 remaining head of cattle, given Harrell Ranch's certified operations and beef quality, and the amounts actually received in the liquidation sales. The amounts actually received

14

for the bulls, cows, calves, and yearlings were based on receipts from the sales at the commodity market.[7] Harrell Ranch's calculation of market value for its bulls was based on prior sales, and for the cows was based on national averages. For the bulls and cows, therefore, no expenses needed to be deducted because profits were not based on a future projection, but were based on the animals at the time of sale, such that any applicable expenses had already been paid.

According to Samuel Harrell's testimony, the calculation of market value for the calves and yearlings—$3,001 per head—came from the State's appraiser's report of Harrell Ranch's price per pound, assuming each calf and yearling reached 1,450 pounds when fed out to 27 months of age, although, according to Harrell, Harrell Ranch typically received $3,400 per carcass. Harrell testified that he used the lower figure to be conservative. However, Harrell also testified to an additional reason for the $3,001 value: he had determined that the required expense to finish out a head of cattle to 27 months was $363, which amount was covered by the reduction from the typical price per carcass of $3,400 to the $3,001 value used for lost profits. Consequently, the jury had two possible amounts from which to deduct applicable expenses. We find it reasonable and not clearly wrong or unjust for the jury to have accepted the $3,001 figure as consisting of a per-carcass sales price of $3,400 and a per-carcass deduction for expenses that would have been incurred to obtain that sales price.

---

[7] The State does not challenge Harrell Ranch's failure to admit such receipts into evidence. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) ("Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.").

Because a reasonable juror could conclude that the amount sought for lost profits took expenses into account, and such a finding is not clearly wrong or unjust, we hold that the evidence was legally and factually sufficient to support the jury's award of lost profits.

### *Diminution in Value of the Remainder Property*

In addition to the award of lost profits for impairment of access, the jury awarded Harrell Ranch $2,312,026 for the 173.712 acres taken by the State and $3,178,983.40 for the diminution in value of the remaining 116.662 acres. The State argues on appeal that the $3,178,983.40 award is outside the range of valuation evidence admitted at trial. The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). Under this standard, we examine all of the evidence to determine whether the award is supported by sufficient evidence and order remittitur only if the award is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* at 406-07.

In valuing the loss in value of remainder property in a condemnation case, the fact finder is not entitled to depart from the range of value admitted as evidence. *See State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ) ("In a condemnation case, the jury is allowed to set the value at any amount between the lowest and highest values the expert witnesses put in evidence."); *see also Parallax Corp. v. City of El Paso*, 910 S.W.2d 86, 91-92 (Tex. App.—El Paso 1995, writ denied) (jury can depart from expert valuations if other evidence presented at trial is sufficient for the jury to do so); *Pleasant v. Bradford*, No. 03-07-00167-CV, 2008 Tex. App. LEXIS 4821, at *32-33 (Tex. App.—Austin June 26, 2008,

pet. filed) (damages award not arbitrary simply because it does not match up precisely with the figures presented by expert witnesses). The jury in this case was presented with three different valuations of the damages to the remainder property. One of Harrell Ranch's expert witnesses, Rudy Robinson, testified to a $2,816,820 value, and Harrell Ranch's other expert, James Archibald, testified to a $2,661,934 value. The State's expert witness presented an $861,415 valuation. Each of these valuations was based on a different methodology and applied differently to the portions of the property taken and those that remained.

The jury has discretion to take into account damage amounts that overlap between multiple categories of damages. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 773 (Tex. 2003) ("[I]n reviewing a challenge that an award for a category is excessive because there is factually insufficient evidence to support it, a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages."). In this case, there was disagreement among the expert witnesses on how to account for the land's NHTC and organic certifications. Robinson valued the certifications at 40% of the property's value, or $2,200,000, and assigned the entire premium to the taken portion only. Archibald valued the certifications as a 10% annual increase for the three years over which the property became qualified for the certifications, and then divided the total premium between the taken portion and the remainder portion on a per-acre basis.[8] The State's expert witness, taking the position that the property's pre-taking highest and best use was for residential development, did not

---

[8] Thus, under Archibald's assessment, after the three-year waiting period for the certifications, the $17,500-per-acre value for the entire Harrell Ranch property had become $23,293 per acre.

17

attribute any certification premium to the property and, thus, did not allocate a premium between the taken portion and the remainder portion.

There is nothing in the record to inform us of the jury's reasoning in arriving at its $3,178,983.40 award for remainder damages. From our review of the evidence, if a certification premium is included in the calculation, a value in the range of the jury's damages award is obtained. Particularly, by using Robinson's valuations, but allocating his $2,200,000 premium by acreage rather than to the taken portion only, the result is a $3,574,374 value of the part taken[9] and a $3,700,702 value of the diminution in the remainder.[10] Given these possible applications of the evidence, the jury award for the diminution in value of the remainder falls within the range of evidence and is not excessive. *See id.* at 773-74 (where only one category of damages is contested, a court of appeals should consider evidence unique to the category *and* evidence that might overlap between that category and another). We must, therefore, ask whether the jury would have been entitled to combine Robinson's valuation of the certification premium and Archibald's method of allocating the premium.

---

[9] This $3,574,374 amount is the sum of Robinson's land valuation of $2,258,256 (173.712 acres at $13,000 per acre) and a certification premium of $1,316,118 (the portion of the $2,200,000 certification premium attributable to the taken portion's acreage).

[10] This $3,700,702 amount is the sum of $2,760,726 (the diminution amount according to Robinson's testimony), $883,882 (the portion of the $2,200,000 certification premium attributable to the remainder's acreage), and a $56,094 cost to cure. Robinson's $2,760,726 amount consisted of a pre-taking land valuation of $1,516,606 (116.662 acres at $13,000 per acre), $961,500 for improved pastures, $675,684 as the depreciated value of site improvements, and an adjustment of $90,000 made to reflect the sales comparison approach, less a $480,000 post-taking land valuation, the $1,018 value of the easement taken (which he had already set out as a separate damages award), and a rounding amount of $2,046 (in calculating the pre-taking valuation of the property, Robinson rounded one figure up by $138 and another figure down by $2,184).

We are guided by the Texas Supreme Court's analysis in *Callejo v. Brazos Electric Power Cooperative, Inc.* 755 S.W.2d 73 (Tex. 1988). In that case, the court recognized that jurors "are not bound, as a matter of law, to accept the parties' expert testimony" and yet may not "leap entirely outside of the evidence in answering any question submitted to them." *Id.* at 75. Therefore, the jury in the court below was not bound to simply accept or reject Robinson's certification allocation method as a whole, and because Archibald testified to allocation by acreage, the jury could have employed that allocation method without "leaping outside of the evidence." The State expresses concern that the jury's award might involve the type of blending of expert opinions that was rejected by the court in *Callejo*. In *Callejo*, the jury in a condemnation proceeding had found a post-taking value of remainder property more than ten times higher than the largest amount provided by expert testimony. *See id.* at 74. The court, finding that the jury had blended testimony on pre-taking value with testimony on post-taking value, rejected the jury's answer on the post-taking valuation. *See id.* at 75-76. We do not have any confusion here between pre-taking and post-taking values. Furthermore, both Robinson and Archibald calculated the certification premium on the same basis—a percentage increase on the pre-taking value of the entire Harrell Ranch property. Despite basing the certification premium on the entire property's pre-taking value, Robinson allocated the entire premium only to the taken portion. Nothing about Robinson's method to determine the amount of the certification premium prohibited the amount from being allocated equally by acreage, and in fact, the certifications applied equally to every acre on the property. We conclude that combining Robinson's premium valuation with Archibald's premium allocation method would not result in an improper blending of expert testimony.

19

*Conclusion*

We conclude that Harrell Ranch had no right of access to its property as of the date of taking and was entitled to recover lost profits caused by such material and substantial impairment. We hold that lost profits are recoverable in an inverse condemnation proceeding whether the business is intending to be ongoing or winding down at the time of the loss. We also conclude that the evidence was legally and factually sufficient to support the jury's award of lost profits. Finally, we conclude that the evidence was factually sufficient to support the jury's award for diminution in value of the remainder property. We affirm the judgment of the trial court.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed:   August 29, 2008

