**AFFIRMED; Opinion Filed August 6, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-11-01622-CV

_____

### THE STATE OF TEXAS, Appellant
### V.
### RODGER A. JOHNSON, Appellee

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-08-08424-E**

## OPINION

Before Justices Moseley, Lang, and Richter[1]
Opinion by Justice Moseley

This is a condemnation case. The State of Texas appeals an adverse judgment in favor of

the landowner, Rodger A. Johnson, which was entered following a jury verdict. In five issues,

the State argues the trial court erred by finding the condemnation would result in a material and

substantial impairment of access to Johnson's property; creating an exception to the rule that

circuity of travel is not compensable in condemnation proceedings; admitting expert opinions

that a change in access to Johnson's property would render his four-story office building useless;

and instructing the jury it could consider whether the remainder of Johnson's property would be

less safe because of the State's taking. The State also argues there is no evidence or insufficient

---

[1] The Hon. Martin Richter, Justice, Assigned

evidence to support the jury's award of over $3 million for damages to the remainder of the property. We overrule the State's five issues and affirm the trial court's judgment.

## BACKGROUND

Johnson owned 114,507 square feet of property located at 415 East Airport Freeway in Irving, Texas (the Property). The Property includes a four-story office building that was constructed about 1978. Johnson leases space in the building to various tenants. The State condemned 3,569 square feet of the Property to expand State Highway 183 (SH 183), which runs along the south side of the Property. The condemned area does not include any improvements other than landscaping and concrete paving. After the condemnation, Johnson will continue to own approximately 111,000 square feet of property and the existing office building (the Remainder).

Before the State condemned a portion of the Property, Johnson had two routes to access the Property: a thirty-foot private access road and a two-lane U-turn road.[2]

### A.     LOCAL ACCESS ROAD

The Property is located near the intersection of SH 183 and Villa Court road in Irving, Texas. Villa Court is east of the Property. The Property is near a one-way, two-lane access road that runs along the south side of SH 183, passes underneath SH 183 to the north side, and runs in front of the Property (Old Access Road). The Old Access Road is at least twenty-four feet wide at all points. The Property is not accessible directly from the Old Access Road. Rather, the Old Access Road intersects with Villa Court, and access to the Property is from Villa Court.

As part of the construction to widen SH 183, the Old Access Road will be removed, and a new access road will be built. When SH 183 is expanded, a similarly shaped U-turn road will be

---

[2] At the time of this appeal, Johnson's property had been condemned, but construction had not begun in the area surrounding the Property. Thus, the property was accessible as it previously had been.

built, but with different dimensions (New Access Road). The New Access Road will be twenty-four feet wide on the north and south sides of SH 183. However, where the New Access Road runs underneath the highway and creates a "Texas U-turn," it will be only eighteen-feet wide. Johnson presented evidence that the width of the New Access Road does not comply with the City of Irving's fire code. After construction, the only means of accessing the Remainder will be the New Access Road via Villa Court.

### B. OTHER ROADS TO ACCESS THE PROPERTY

In addition to the Old Access Road, the Property is accessible from a two-way, private road that lies between the Property on the north side and the Old Access Road on the south side (the Private Road). The Property is directly connected to the Private Road, and the Private Road connects the Property to Wingren Road, which is a city street to the west of the Property, and Villa Court to the east of the Property. As part of the construction project, the Private Road will be eliminated.

Johnson owned a portion of the Private Road, and had a cross-access easement that allowed Johnson and his tenants to use all of the Private Road; the Private Road gave Johnson and his tenants access to Wingren Road.

### C. ACCESS TO THE REMAINDER DURING CONSTRUCTION

Before trial, Johnson filed a "Supplemental Claim for Constitutional Compensation," which asserted that "During the period of construction (a time that is incapable of delineation), Mr. Johnson's access [to the Remainder] will be totally denied. This temporary, total denial of access will be a material and substantial impairment of access that causes material damage to Mr. Johnson's remainder property." The basis for Johnson's assertion of temporary, total denial of access is the language of the State's Sixth Amended Petition, which states:

> [The State] . . . has designated said highway as a controlled access highway . . . to
> which access from [Johnson's] remaining land, from which the herein-condemned

land is severed, will be permitted except where specifically denied in the property description described in Exhibit "A",[3] with the exception that the State reserves to the fee owner of the property out of which Exhibit "A," is condemned, the temporary right of an access easement within the areas described in Exhibits "B," "C," and "D," attached hereto and incorporated herein, to allow said fee owner to continue to use and maintain the described two-way driveway/fire lane [the Private Road] until such time as the construction of the frontage road on the north side of SH 183, between Wingren Road and Villa Court begins. Upon completion of the SH 183 project between Wingren Road and the BNSF Railroad, [Johnson] will be provided access to a one-way U-turn road [the New Access Road] adequate to accommodate typical highway traffic, including emergency vehicle, and built substantially similar to the road depicted in the shaded area in attached Exhibit "E."

Thus, the State's Petition reserves to Johnson access to the Remainder before construction begins and after construction is completed; it makes no mention of access during construction.

At trial, the parties offered contradictory testimony about whether Johnson and his tenants would have continuous access to the Remainder during construction, or whether the State's Sixth Amended Petition fails to protect Johnson's access to the Remainder and will cause a total, temporary denial of access.

Johnson offered evidence, including the State's Sixth Amended Petition, that he will suffer a total temporary denial of access. Johnson testified to his interpretation of the Sixth Amended Petition. Over objection, Johnson testified: "When this [trial] is concluded one person, me, no one else, will have access to that [Private Road]; not my tenants, not my employees, not my vendors. The only person that has access to that road legally will be me." However, once construction begins, he testified no one (not even Johnson) would be able to use the roads to the Remainder. Johnson stated there would not be any legal access to the Remainder during construction.

---

[3] Exhibit A is a property description for the 3,569 square feet the State condemned.

–4–

Johnson also testified he would have to disclose to any potential buyer of the Remainder that there is not guaranteed right of access to the Remainder until the construction is completed.

Mark Sikes, a real estate appraiser who testified for Johnson, testified there would be "an unknown time period when this property is not going to have access" and the market would "penalize the property" for that. He stated that "Nobody's going to buy the office building . . . there's no ability to know what's going to happen. You've got a pending cloud. You know, it's like a cloud on title. And typically when you have a cloud on title, the transaction doesn't close."

Brian Shuler, a real estate appraiser who also testified on Johnson's behalf, testified there would be no access to the Remainder from the time the construction begins on the Old Access Road until construction is complete. Shuler testified that lack of guaranteed access will make the Remainder "unrentable and unsaleable." Shuler also stated: "The Engineers testified that they would have to close down that loop road when they were building the bridge [of SH 183 over the Texas U-turn]. So, at the very least, that's going to be a total denial of access during the construction of the bridge."

David Bolton, another real estate appraiser who testified for Johnson, testified:

> Additionally, the property will, as I read it, will be totally landlocked or without access for a certain period of time and [sic] has not been defined. So if you have a property that if you go to sell it in the marketplace and you reveal to a potential buyer that on the date of taking in October of 2009 that in the future you're going to have a building that your tenants can't get to the property so therefore you would assume they would leave and you can't tell that prospective buyer how long that will last, I think that renders feasibility of the improvements nil. And so I think what those kinds of changes would no longer make the improvements feasible as part of the best use of the property.
> And in my opinion you would be . . . you would simply, probably, raise [sic] the improvements, get rid of the improvements and hold the land for some future date to when you could get access or the possibility of selling it - - small possibility of selling it to, maybe, a joint owner.

–5–

Later in his testimony, Bolton again was asked how he thought the market would value the Remainder after the acquisition. He said:

> . . . there is the denial of access to the property, the complete denial of access to the property for some period of time. And from - - as I read the petition, that would be an issue when revealed to a potential buyer, would - - there's no answer to the question, so I believe that that makes the value of the improvements not feasible to be included in a purchase price by an informed investor. So I think it changes the use of the property being used because the improvements no longer have the same intended use.

The State also presented evidence on the issue. The State offered testimony from Maurice Pittman, the assistant area engineer for the Texas Department of Transportation (TXDOT). Pittman testified that TXDOT construction contracts incorporate the TXDOT specification requiring property owners maintain access to their properties during construction. He testified construction could be accomplished in phases so that Johnson would have continuous access to the Remainder. Likewise, Chad Gardiner, an engineer who is employed by an engineering firm that performs work for TXDOT, testified that "TxDOT tries to maintain access to all properties," even when a bridge is demolished. When access to a property is affected, then detour routes are generally established during road closures.

However, Gardiner testified he did not know how access would be provided to the Remainder during construction, but he "was informed by Mr. Pittman that they [landowners] would maintain access to those properties through any road closure that dealt with demolition of those bridges or construction of proposed bridges." In Gardiner's experience, the contract between the State and the contractor building a project such as the SH 183 project includes language that the contractor is obligated to maintain access. Gardiner agreed with the State's attorney that based on his experience, it was "reasonably probable" that Johnson would have access to the Remainder at all times during construction.

### D.    MARKET PERCEPTION OF JOHNSON'S PROPERTY

At trial, Johnson and his expert witnesses testified that the market's perception of Johnson's land would negatively change as a result of the condemnation. In addition to the concerns about a total, temporary denial of access during construction, Johnson and his experts gave two additional reasons for the changed perception: (1) after construction, the Remainder would have insufficient access for emergency vehicles and, as a result, would no longer comply with the Irving fire code and (2) the highest and best use of the Property would change as a result of the condemnation.

At trial, Johnson argued that, as a result of the condemnation, the Remainder would no longer be in compliance with the City of Irving's fire code and the roads available to the fire department to access his property would result in response times that are below the standards set by the City of Irving. Johnson testified that if he made improvements to the building of more than $300,000, the Remainder (including the office building) would have to become fully compliant with the fire code as if it had been built brand new. The State put on evidence to the contrary—the Remainder would not violate the fire code after the condemnation.

Johnson testified that if he were to sell the Remainder, he would be required to disclose that it was not in compliance with the fire code. Lacking fire code compliance would significantly affect the market value of the Remainder because a potential buyer who learned that it was not in compliance with the fire code probably would not consider purchasing the Remainder.

#### 1.    Mark Sikes's Testimony

Sikes explained the State's taking increased the risk of ownership associated with the Remainder: "There are a lot of ifs with this property that it didn't have before." Sikes testified the market penalizes a property for risk, and a potential buyer would pay substantially less for

the Remainder because of the risk. He explained: "There's certain provisions in the fire code that's in violation. As a knowledgeable buyer or seller, you need to make darn sure that you're a legally—you're a legally permissible use."

Sikes testified: (1) "from the acquisition of the 3,000-plus square feet by TxDOT and the elimination of the private-access driveway," there are violations of the fire code; (2) "I mean, this property is part of the [State Highway] 183 expansion that—that is losing its primary point of fire-code access. The market's going to know about it"; and (3) if Johnson or a future owner of the Remainder wanted to complete a major renovation of the office building, he may not be able to obtain a certificate of occupancy because the building would not comply with the current fire code.

Sikes also opined that because the Remainder would no longer comply with the fire code, the highest and best use of Johnson's land would change as a result of the State's taking. Before the taking, the highest and best use of the Property was as an office building; after the taking the office building would be obsolete and the Remainder's highest and best use would be for light industrial use. The change in the highest and best use stems from changes to the roads providing access to the Remainder, which will render it non-compliant with the fire code.

During his testimony, Sikes read from an unidentified document: "After the taking, the property violates the City of Irving fire code and zoning ordinance. The violations increases [sic] the property risk of the legality of potential renovation, repair or modification and eliminates expansion of the property, negatively impacts the ability to finance or insure the property and results in a change in the highest and best use."

### 2. Brian Shuler's Testimony

Shuler testified the existing improvements on the Property reflect the highest and best use for the Property before the State's taking. However, after the State's taking, the highest and best

use for the Remainder would be to tear down the existing improvements and use the Remainder for industrial purposes; the existing uses would not be supportable after the taking. The change in highest and best use would reduce the value of the land because industrial properties generally sell for less than properties used for office buildings.

Shuler testified that by removing the land taken by the State, the Remainder would suffer from access and safety problems. Shuler explained: "You have a situation where you can no longer meet the basic safety requirements of the fire code for emergency vehicles," and access issues would "impact[] safety as well as just direct access." Additionally, he stated the value of Johnson's property would be diminished after construction because there would only be one point of entry to the Remainder and, if that entry point were closed off for any reason, such as a traffic accident, then there would be no access to the Remainder. These changes would render the office building unsaleable and unrentable.

### 3. David Bolton's Testimony

Like Shuler, Bolton concluded the State's taking would cause a change in the highest and best use of Johnson's property. At the time of the taking, the highest and best use of the Property was as an office building. Bolton reached that conclusion after considering the office building had been on the Property for several years, it has a tenant history, it has good exposure and is accessible, and the building and site plan approval allow the owner to build additional improvements. However, Bolton testified, the highest and best use of Johnson's property changes as a result of the State's taking because the Remainder will not be in compliance with the fire code of the City of Irving. Additionally, the Remainder "will be totally landlocked or without access for a certain period of time and has not been defined." If Johnson desired to sell the Remainder, he would have to disclose the problems to a potential buyer, and "that renders the feasibility of the improvements nil." As a result, Johnson likely would have to demolish the

–9–

improvements and "hold the land for some future date to when [he] could get access or the possibility of selling it," which Bolton called a "small possibility."

### E. JURY CHARGE

The jury was only asked two questions.[4]

QUESTION NO. 1

As of October 14, 2009, what was the fair market value of the 3,569 square feet of property acquired by the State, including all improvements contained on the property taken, considered as severed land?
    Answer in dollars and cents.
    Answer: *63,590.16*

QUESTION NO. 2

What are the damages, if any, to the remainder—that is, the remaining 110,994 square feet of Mr. Johnson's property and the improvements located thereon that are caused by the acquisition set forth in the previous question?
    Answer in dollars and cents.
    Answer: *3,059,535.74*

### LAW & ANALYSIS

When the State takes only part of a landowner's property, the State must make adequate compensation both for the part taken and for any severance damages to the remainder not taken. *Cnty. of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004); *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W.3d 723, 728 (Tex. App.—Dallas 2006, pet. denied). This appeal concerns the proper measure of severance damages with respect to the Remainder. Such damages are generally calculated by taking the difference between the market value of the remainder property immediately before and after the condemnation, considering the nature of any improvements and the use of the land taken. *Santikos*, 144 S.W.3d at 459.

### A. MATERIAL & SUBSTANTIAL IMPAIRMENT OF ACCESS

In its first issue, the State argues the trial court erroneously found a material and substantial impairment of access to the Remainder during construction.

---

[4] The jury's hand-written responses to the questions are italicized.

At trial, Johnson argued the State's final pleading, the Sixth Amended Petition, creates three time periods (before construction begins on the Private Road, after construction of the New Access Road begins, and upon completion of the SH 183 project in front of the Remainder), and he has different access rights to his property during each of these times. Johnson believes that the State's Sixth Amended Petition does not give him a written guarantee of access from the Remainder to any roadway between the time construction of the New Access Road begins and the time the construction of SH 183 in front of the Remainder is completed. Johnson asserts that construction will cause him to lose the right to use the Private Access Road and he also will lose access to the Old Access Road, which will be removed to construct the New Access Road. His brief states that "[d]uring this interim period, Mr. Johnson has no written right to use any roadway that connects to his property."

The State contends that Johnson "misread[s] the language" in the petition. In its brief, the State argues the Sixth Amended Petition never states that access to the Remainder will be denied. Rather, the petition states that access "will be permitted except where specifically denied," and there is no denial of access at the locations of two of the Remainder's current driveways. The State believes the trial court improperly admitted evidence relating to a total, temporary loss of access; the trial court erred by refusing the State's jury instruction on this issue; the proper measure of damages for a total, temporary loss of access was lost profits, which Johnson failed to show; and the trial court did not have jurisdiction to consider whether there was a total, temporary loss of access. The State obtained a running objection to Johnson's presentation about total, temporary loss of access.

The jury did not make a specific finding about whether Johnson suffered any injury caused by a temporary but total restriction of access to the Remainder as a result of the condemnation. In the jury charge conference, the State requested a jury instruction that "in

arriving at your answer to Jury Question No. 2, you are not to award any compensation for any total temporary denial of access during the construction of the project." The trial court refused to include the State's requested instruction.

### 1. Jurisdiction

The State contends that if its Sixth Amended Petition effected a total, temporary denial of access, then the trial court lacked jurisdiction to consider the issue.

The trial court's appellate jurisdiction in a condemnation case is limited to the parties and issues involved in the administrative proceeding before the special commission, as set out in the condemning authority's petition. *Brown v. State*, 984 S.W.2d 348, 350 (Tex. App.—Fort Worth 1999, pet. denied) (citing *Patrick Media Grp., Inc. v. Dallas Area Rapid Transit*, 879 S.W.2d 375, 377 (Tex. App.—Eastland 1994, writ denied)). Although a condemning authority has a right to amend its petition to correct errors or to take less property, it can do so only as long as the exercise of the right does not prejudice the landowner. *See id.* (citing *State v. Nelson*, 160 Tex. 515, 334 S.W.2d 788, 790 (1960) ("... [A] court does not have unlimited power to enlarge the subject matter of a particular cause by allowing amendments to the pleadings. It could not, for example, acquire by amendment the power to condemn land which is not described in the [petition] for condemnation and where there is nothing in the [petition] to suggest that the condemning authority intended to take the same.")).

Even if the issue of whether Johnson will suffer a total, temporary denial of access was a new issue raised before the trial court after the commissioners' hearing, we do not conclude the trial court lacked jurisdiction to consider the case. The State's Sixth Amended Petition did not change the property to be condemned. *See State v. PR Invs. & Specialty Retailers, Inc.*, 180 S.W.3d 654, 665 (Tex. App.—Houston [14th Dist.] 2005), *aff'd* 251 S.W.3d 472 (Tex. 2008). Rather, if the total, temporary denial of access was a new issue, then the Sixth Amended Petition

–12–

may have changed the damages to which Johnson may be entitled. No statutory provision or case law requires the damage issues in the trial court to be the same as those considered by the commissioners. *Id.* Because any change to the State's petition related to the damages caused by the taking rather than an increase in the amount of the land taken, we conclude the trial court did not lose jurisdiction over the case.

## 2. Trial Court's Conclusion on Total, Temporary Loss of Access

The State argues the trial court erroneously found a material and substantial impairment of access and it was harmed when the trial court admitted evidence showing Johnson would suffer a total, temporary denial of access during construction.

A landowner may recover damages for impaired access if the trial court determines his access rights have been substantially and materially impaired by the taking. *See Dallas Cnty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 45 (Tex. App.—Dallas 2012, pet. denied) (citing *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996)). Damages are not recoverable unless there was a total temporary or partial permanent restriction of access, or a partial temporary restriction of access due to illegal or negligent activity. *Id.* (citing *State v. Schmidt*, 867 S.W.2d 769, 774–75 (Tex. 1993); *City of Austin v. Ave. Corp.*, 704 S.W.2d 11, 13 (Tex. 1986)). Whether the landowner in a condemnation case has suffered a substantial and material impairment of access is a question of law for the court to determine. *Id.* By admitting evidence that Johnson will suffer a substantial and material impairment of access, the trial court necessarily determined that Johnson suffered a substantial and material impairment of access to his property. *See id.* We review this legal determination de novo. *Id.*

The State's Sixth Amended Petition states access to the Remainder "will be permitted except where specifically denied" in the property description attached as Exhibit A. Additionally, the Petition makes two affirmative grants of access, giving the "fee owner" the

–13–

right to use the Private Road until "construction of the frontage road on the north side of SH 183, between Wingren Road and Villa Court begins," and giving specific access to the New Access Road after construction is completed. However, the State's pleading did not address whether or how access to the Remainder would be provided during the period of time after the State removes the Private Road and the Old Access Road, but before the New Access Road is completed.

We presume the State will "exercise its rights and use and enjoy the property taken to the full legal extent." *State v. Harrell Ranch, Ltd.*, 268 S.W.3d 247, 254 (Tex. App.—Austin 2008, no pet.) (quoting *Creighton v. State*, 366 S.W.2d 840, 843 (Tex. Civ. App.—Eastland 1963, writ ref., n.r.e.). However, where the State reserves rights of ingress and egress to the landowner, those statements "are property rights and easements." *State v. Frost*, 456 S.W.2d 245, 255 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.); *see also State v. Delany*, 197 S.W.3d 297, 299 (Tex. 2006) ("Petitions for condemnation can preserve easements of access for the remaining property of those owners whose land has been condemned."). To the extent that the State simply states in its pleading that a landowner can continue to use property after a condemnation, those statements "constitute mere promissory statements or declarations of future intentions by a condemnor and are invalid, or they constitute mere offers made by the condemnor and not accepted by the landowner." *Frost*, 456 S.W.2d at 255; *see also Creighton*, 366 S.W.2d at 840-43.

There appears to be no dispute that the Private Road and the Old Access Road must be demolished so that the New Access Road can be constructed. There is no evidence the State entered into any formal agreement with Johnson to provide access to the Remainder between the date that construction begins to remove the Old Access Road and the Private Road and the date of completion of the New Access Road. The only evidence is Johnson has a right to access the

–14–

Remainder before construction begins and after construction is completed. *Frost*, 456 S.W.2d at 255. Although the State presented evidence of its policy to require its contractors to provide access to landowners such as Johnson during construction, evidence of the State's general policy does not undermine the State's ability to deny access at any time it desires. *See Harrell Ranch*, 268 S.W.3d at 254 (citing *GAR Assocs. III v. State*, 224 S.W.3d 395, 403 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (property owner's use of parking lot, under State's lease agreement with city for such use, was "temporary permissive use" that could not be enforced when the State terminated the lease); *Frost*, 456 S.W.2d at 254–55 (promissory statements of landowner's permitted access can be revoked at the pleasure of the condemnor); *City of Corpus Christi v. Polasek*, 404 S.W.2d 826, 831–32 (Tex. Civ. App.—Corpus Christi 1966, no writ) ("At most, a temporary permissive use is shown, and that is subject to appellant's legal right to change it in the future."); *Creighton*, 366 S.W.2d at 843 (for diminution of remainder's value, State could not present testimony on permitted uses during construction because such "testimony was not relative to a right granted appellants but to a privilege which might be granted, refused, or, if granted, revoked at the pleasure of appellee").

Because: (1) the Petition did not provide Johnson with a right of access to and from the Remainder throughout construction; (2) Johnson did not enter into an agreement whereby Johnson would be provided access to the Remainder; and (3) we presume the State will exercise its full rights to the land taken, we conclude the trial court did not err by concluding Johnson would suffer a total, temporary denial of access to the Remainder, which would constitute a material and substantial impairment.

### 3. Jury Instruction and Damages

On appeal, the State generally argues the trial court erred by refusing the State's proposed jury instruction that the jury could not award compensation for a total, temporary denial of

–15–

access in response to Jury Question Number 2. The substance of the State's argument is that the proper measure of damages for a total, temporary denial of access is lost profits during the period of time when access is denied, Johnson failed to offer any evidence of lost profits and also failed to request a separate jury question regarding lost profits, and, therefore, the trial court erred by allowing the jury to consider a total, temporary denial of access in its response to Jury Question Number 2.

Rule 277 of the Texas Rules of Civil Procedure requires the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. We do not disturb the trial court's decision about which instructions to submit to the jury absent an abuse of discretion. *Curtis v. AGF Spring Creek/Coit II, Ltd*, 410 S.W.3d 511, 514 (Tex. App.—Dallas 2013, no pet.) (citing *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.)). A trial court has more discretion when submitting instructions than when submitting questions. *Id.* When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Id.* (citing *Shupe*, 192 S.W.3d at 579). The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *Id.* (citing *Shupe*, 192 S.W.3d at 579); *see* TEX. R. APP. P. 44.1(a).

"The method for measuring damages resulting from impaired access is the same as for severance damages—diminishment in the value of the landowner's property." *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 337 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 2 (Tex. 1969)); *see also State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 879 (Tex. 2008) (landowners not entitled to compensation for diminished value of remainder because they had not suffered material and

–16–

substantial impairment of access); *Lethu Inc. v. City of Houston*, 23 S.W.3d 482, 485-86 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (internal citations omitted) (inverse condemnation) ("a landowner is entitled to compensation for damages resulting from a material and substantial impairment of access. This includes compensation for the diminution in value of the property resulting from the loss of access."); *City of Austin v. Ave. Corp.*, 685 S.W.2d 453, 455 (Tex. App.—Austin 1985) rev'd on other grounds, 704 S.W.2d 11 (Tex. 1986) (inverse condemnation) ("diminution in value of property resulting from loss of access may constitute damage within the relevant constitutional provisions so that no person's property shall be taken, damaged, destroyed, or applied to public use without adequate compensation.").

The trial court refused to give the State's requested instruction that would have instructed the jury that it could not award compensation for a total, temporary denial of access in response to Jury Question Number 2. Jury Question Number 2 asked the jury what damages, if any, were caused to the remainder property as a result of the acquisition. The jury was instructed that when responding to Jury Question Number 2, it should consider the difference in the fair market value of Johnson's property before and after the taking. Essentially, the jury was asked to calculate the diminished value of Johnson's property.

Because Jury Question Number 2 asked the jury to calculate the diminished value of the property and because the State was required to compensate Johnson for the diminishment in the value to his property as a result of the condemnation—which will result in a total, temporary denial of access—the State's requested instruction was not reasonably necessary to enable the jury to render a proper verdict. The trial court's jury charge asked the jury to do precisely what was required—determine the damages, if any, to the remainder as a result of the condemnation.

The State argues that lost profits is the proper measure of damages for a material and substantial impairment of access, and there are Texas cases that indicate lost profits are relevant

–17–

to the analysis. *See State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009); *Avenue Corp.*, 704 S.W.2d at 13 (landowner who failed to show material and substantial interference with access to property could not recover lost profits); *Crestview Corners Car Wash*, 370 S.W.3d at 39; *Harrell Ranch*, 268 S.W.3d at 253; *State v. Whataburger, Inc.*, 60 S.W.3d 256, 261 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Traditionally, there are three methods of calculating market value: (1) comparable sales method; (2) income method; and (3) cost method. *Whataburger, Inc.*, 60 S.W.3d at 262. When the market value of a property is determined by an appraiser using the comparable sales method, "the profitability of the property is an inherent factor because a willing buyer will normally pay more for a tract containing a profitable enterprise than for a similar tract containing an unprofitable enterprise. Thus, the ability of a business to make a profit is reflected in its market value. Whether there is an interruption of profits . . . is of no moment because [the landowner] has been fully compensated for the taking." *Id.* (internal quotations and citations omitted). The same is true when the income method is used. Permitting an award for lost profits would constitute a double recovery. *Id.*

Shuler testified to the value of Johnson's property based on the comparable sales method. Bolton used an income method to value the Property. Because Johnson's experts used valuation methods that considered the ability of his property to generate money, allowing Johnson to recover for lost profits would have constituted a double recovery. *See id.*

We overrule the State's first issue.

### B.    CIRCUITY OF TRAVEL

In its second issue, the State complains the trial court improperly created an exception to the longstanding rule that circuity of travel is not compensable in a condemnation proceeding. The State argues the trial court improperly admitted evidence showing emergency vehicles will

–18–

be required to travel farther to access the Remainder than they traveled before the taking. The State also argues the trial court erred by refusing to give the State's requested jury instruction that increased circuity is not compensable.

At trial, Johnson presented evidence that if a fire occurred at the Remainder, the response time by the fire department would be longer as a result of the taking than it had been before.

Johnson presented testimony from Jim Tidwell, a consultant on fire and building codes who previously worked for the Fort Worth Fire Department for 30 years. Tidwell testified Irving Fire Station 8 is the station that would provide the first ladder truck in response to a fire at the Remainder. Before the State's taking, the ladder truck would have used the Private Road to drive to the Property. After the taking, it will use the New Access Road to access the Remainder. Johnson's counsel asked Tidwell to determine the additional distance the ladder truck would travel to the Remainder after construction; Tidwell performed the measurement using his personal vehicle, not surveying equipment. He concluded that the fire apparatus from Station 8 would travel an additional 1.2 miles to the Remainder.

After Tidwell testified, the trial court held a hearing outside of the presence of the jury at which the State objected that Tidwell testified to circuity of travel. The trial court concluded that: "Both sides agree the law is that circuity of travel, to the extent it causes an inconvenience or frustration or anything like that, is not compensable. And I don't think that's what Mr. Tidwell's testimony is. . . . Mr. Tidwell's testimony and what you can put on is to circuity of travel as it relates to any code violations, fire code or otherwise. [Johnson] can go into that. And to the extent that circuity of travel creates a good-faith, based-in-fact perception of a safety issue, not an inconvenience issue, you can go for that. . . . I'll instruct the jury what you're saying. . ."[5]

---

[5] There is no indication the trial court instructed the jury about limits to Tidwell's testimony, but the State also did not object to the trial court's failure to do so.

–19–

Counsel for Johnson sought to question Chad Gardiner about how much farther a fire truck would have to travel to access Johnson's property after the taking than it did before. After counsel for the State objected, the trial court instructed the jury: "You're instructed in general - - increased length of travel of inconvenience to the public is not something that you should consider as compensable damage, but safety issues are. So if the testimony goes to the safety issue, you can consider it for that purpose." Gardiner then testified a fire truck would be required to travel an additional 1.4 miles to access the Remainder. Gardiner testified about the posted speed limits at various points on the service roads and the Texas U-turn. He did not testify about how much longer it would take for a fire truck to access the Remainder.

Johnson's counsel subsequently returned to this line of questioning with Gardiner, and the State objected again. The trial court told the jury: "And, ladies and gentlemen, the objection is overruled. You can consider the exhibit as it relates to safety issues, not the convenience or extra length of travel of the general public." Gardiner then testified the difference in time for a fire truck to travel to the Remainder after the construction was completed would be an additional 121 seconds. Gardiner's testimony assumed the fire truck would be traveling at the posted speed limits.

On appeal, the State argues the trial court erred by admitting evidence of circuity of travel, which is not compensable in condemnation proceedings. Johnson replies that while circuity of travel is not compensable because it is a community damage, whether the fire department has adequate access to a particular piece of property is a safety issue peculiar and unique to each piece of property. He argues he does not seek to recover for the community damage, but for the peculiar and unique damage to the Remainder because of the removal of his easement rights to the Private Road. Further, he argues, the trial court instructed the jury on two

–20–

occasions that evidence about increased length of travel or inconvenience to the public are not compensable damages, except as they pertain to safety issues.

We review a trial court's evidentiary rulings for an abuse of discretion. *See Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 859–60 (Tex. App.—Dallas 2006, no pet.). A trial court abuses its discretion by admitting testimony or evidence if it acts without reference to any guiding rules or principles or if the act complained of is arbitrary and unreasonable. *See id.*

"Restrictions on access that result only in increased circuity of travel are not compensable." *Millwee-Jackson Joint Venture v. Dallas Area Rapid Transit,* 350 S.W.3d 772, 780 (Tex. App.—Dallas 2011, no pet.) (citing *Dawmar Partners*, 267 S.W.3d at 880). The Texas Supreme Court has stated that "damages to remainder property are recoverable only to the extent they represent injuries peculiar to the property owner that are not experienced in common with the general community. It is the nature of the injury rather than proximity to the project that determines this issue." *Santikos*, 144 S.W.3d at 463; *see also State v. Colonia Tepeyac, Ltd.,* 391 S.W.3d 563, 568 (Tex. App.—Dallas 2012, no pet.). "A property owner must . . . allege and prove injuries to his property different from those sustained by the community as a whole to establish a compensable injury. . ." *Wilkinson v. Dallas/Fort Worth Intern. Airport Bd.*, 54 S.W.3d 1, 13 (Tex. App.—Dallas 2001, pet. denied).

Damage to Johnson's property because fire apparatuses will be required to travel further and will take longer to arrive at the Remainder is damage specific to Johnson's property. It is not community damage. The evidence presented by Johnson—and about which the State complains—was not generic evidence showing that access to the Remainder would be compromised for Johnson, his tenants, or other persons attempting to access the Remainder. Rather, the evidence specifically showed that, as a direct result of the State's taking, fire personnel and apparatuses will be delayed when responding to a fire at the Remainder, and the

only road that a fire truck can take to access the Remainder does not comply with the fire code. While any injury to the general community may be increased circuity of travel to access the Remainder, Johnson does not seek compensation for that injury. Rather, he seeks compensation because his property is less accessible for fire apparatuses because of the State's taking. The evidence about which the State complains showed an injury peculiar to this property; the evidence did not reflect an injury experienced by the general community.

Further, the trial court twice instructed the jury that they could only consider the complained-of evidence as it related to safety issues and not as it related to general circuity of travel. When the trial court gives the jury an instruction that limits the use for which the jury can use the evidence presented, we assume that the jury followed that instruction. *See Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 563 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) (citing *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982)). Therefore, we assume the jury limited its consideration of the evidence about which the State complains to the unique injury to the Remainder—increased travel time and distance for fire trucks—and did not use it to consider general circuity of travel.

In light of the evidence at issue and the trial court's limiting instructions to the jury, we cannot say that the trial court's decision to admit evidence about the additional time and distance that a fire truck would have to travel to access the Remainder after construction was without reference to any guiding rules or principles or arbitrary and unreasonable. The trial court did not abuse its discretion.

We also reject the State's contention that the trial court erred by refusing to submit the State's requested jury instruction about circuity of travel.[6] A trial court has broad discretion when submitting jury instructions. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 224 (Tex. 2001). Because we conclude that Johnson's evidence was about the safety issue of fire trucks accessing the Remainder and not general circuity of travel, the evidence was not improperly admitted. Further, the jury was instructed twice about the proper use of the evidence and we assume the jury abided by the trial court's instruction. Based on this record, we conclude the trial court did not abuse its discretion by not submitting the State's proposed instruction.

We overrule the State's second issue.

## C. EXPERT OPINIONS

In its third issue, the State asserts the trial court improperly admitted the expert opinions offered by Brian Shuler and David Bolton. We review a trial court's decision to admit evidence for an abuse of discretion. The decision of whether to admit or exclude evidence is committed to the sound discretion of the trial court. *Lopez*, 200 S.W.3d at 859–60. A trial court abuses its discretion by admitting testimony or evidence if it acts without reference to any guiding rules or principles or if the act complained of is arbitrary and unreasonable. *Id.* at 860.

The specific pieces of testimony about which the State complains are: (1) "Shuler and Bolton[] concluded that the improvements on the property were rendered worthless and should be torn down;" (2) Bolton testified that the New Access Road "would violate Section D.103.2 of the 2006 Fire Code Pertaining to fire lanes;"[7] (3) Bolton testified the Remainder would violate

---

[6] The State requested a jury instruction that "you shall award no compensation for any additional circuitry of travel that may result to a vehicle moving between any other point and the remaining property by reason of the construction of the improvements to the highway facility."

[7] Section D103.2 refers to a provision in the Irving Fire Code, which states:

**Section D103.2 Turning radius.** The minimum turning radii shall be as follows:

For 90 degree or less turns:

the 2006 Fire Code by having only two points of fire apparatus access because there is a third driveway onto the northern portion of the Property; (4) "Shuler and Bolton testified that the market would perceive the remainder property as unsafe;" and (5) Shuler and Bolton "testified that the buildings on the property should be torn down, not because the property was actually unsafe, but because of the "market perception" that the property was unsafe" and they had no market data to support that conclusion. When these pieces of testimony are read together, the State objects that Shuler and Bolton testified that after the State's taking, the Remainder will violate the fire code and, as a result, the Remainder will be unsafe, the market will perceive it as unsafe, and the buildings on the property should be torn down.

The State's brief states: "Shuler and Bolton reached their conclusions [that the change in access to the Remainder would render his four-story office building useless and result in over $4 million in damages] regarding the application of the fire code without consulting anyone from the City of Irving, anyone from the fire department, any engineers or anyone with expertise on the interpretation of fire codes." Therefore, the State argues, their opinions are unsupported and unreliable and should have been excluded. The State also argues their opinions that the market would perceive the Remainder as unsafe are unsupported and unreliable speculation without a basis in reality.

In its argument that Shuler's and Bolton's testimony is unreliable, the State discusses testimony from its own experts that contradicts Shuler's and Bolton's testimony.

---

1.      24' fire lane – minimum internal radius is 30'.

2.      30' fire lane – minimum internal radius is 20'.

For turns greater than 90 degrees, AASHTO Geometric Design Standards shall be utilized.

Widths shall be increased when, in the opinion of the chief, they are not adequate to provide fire apparatus access.

### 1. Harm

We do not reverse a judgment on appeal on the ground that the trial court made an error of law unless we conclude the error complained of probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting its case to the court of appeals. TEX. R. APP. P. 44.1(a); *see also Dept. of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). When determining if the evidence probably resulted in the rendition of an improper judgment, we review the entire record. *See Crestview Corners Car Wash*, 370 S.W.3d at 35. "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Id.* Erroneous admission of evidence is harmless if it is merely cumulative. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Even if we were to assume that the trial court erred by admitting the opinions of Shuler and Bolton about which the State complains, we would not find them to be grounds to reverse the judgment because other witnesses offered similar testimony without objection.

### a. Sikes's Testimony

Sikes offered testimony similar to the testimony the State complains about in its third issue. Sikes testified the Remainder will violate several fire code provisions as a result of the taking; the property will lose its "primary point of fire-code access;" the turning radius on the Remainder will not be in compliance with the fire code; and the market would be aware that the Remainder does not meet the fire code. Sikes stated: "Before the taking the highest and best use is the existing office building. After the taking the highest and best use changes to a light industrial use, rendering the office building obsolete." Later in his testimony, Sikes stated the Remainder would need to be redeveloped, "the improvements in the existing office use would be

demolished, and the site would be used as some type of light industrial use, outside storage, maybe an office warehouse pending a zoning change."

### b. Johnson's Testimony

Johnson also testified the Remainder would not comply with the fire code because the New Access Road was too narrow and the "access points will not comply with code." He stated a buyer in the marketplace who learns that the Remainder does not comply with the fire code "wouldn't even look at it. You just scratch it off your list. Too many other properties out there." The market's perception of the property changes "tremendously" because it would be out of compliance with the fire code.

### c. Tidwell's Testimony

Tidwell summarized three reasons why he believed the State's taking would make it impossible for the Remainder to comply with the fire code: "the width of the access is too narrow. It doesn't comply with the code. The number of access points are too few. It doesn't comply with the code. And the turning rate is too small and won't accommodate what the code requires." He testified that "I couldn't see anything that he [Johnson] could do within his property to remedy the situation."

As to the number of points of access, Tidwell testified that after the construction, "there are two access points" for fire apparatuses to access to the Remainder, whereas before there were three access points. He stated that the "Irving fire code is going to require at least three points of access, fire department access, to this building or to the property." And then: "I'm saying three points of access primarily because you can't diminish the fire-department access that already exists at the property. . . . He [Johnson] has three points of access now. The current code requires three points of access. So . . . it would not be legal to diminish that in any way."

As to the turning radius, Tidwell testified that based on section D.103.2 of the Irving fire code, a thirty-foot turning radius for a twenty four-foot-wide access road is required. The fire code does not contain a provision for a minimum turning radius for an 18-foot wide road because the fire code does not permit 18-foot access roads. The provision gives the fire chief the right to increase the width if it is necessary, but does not permit the chief to decrease the turning radius. If the turning radius is too small, the fire apparatus has difficulty "negotiat[ing] the turn." He testified that the turning radius that the State's taking will create is only 15 feet, which does not comply with the fire code.

### 2. Analysis

The testimony from Shuler and Bolton about which the State complains was cumulative of other evidence in the record to which the State did not object. Sikes, Johnson, and Tidwell all testified that the Remainder will not comply with the Irving fire code after the taking. All three witnesses noted that the Remainder would have insufficient access points for fire apparatuses. While Johnson and Sikes noted that the market's perception of the property would be negatively affected, Sikes testified that the highest and best use of Johnson's property would change from having an office building to light, industrial use and the office building would be "obsolete." Tidwell and Sikes both discussed the problems with the smaller turning radii, which violate section D.103.2 of the Irving fire code.

Even if the trial court abused its discretion by admitting the disputed testimony from Shuler and Bolton, we conclude any such error was harmless. The jury also heard—without objection—testimony from Sikes, Johnson, and Tidwell that was cumulative of the testimony from Shuler and Bolton. The witnesses testified that after the State's taking, the Remainder will violate the fire code and, as a result, the Remainder will be unsafe, the market will perceive it as unsafe, and its best use will be for light, industrial use. Accordingly, the State has not

–27–

demonstrated that the trial court's judgment turns on the allegedly improperly admitted evidence and the error complained of probably caused the rendition of an improper judgment. *See Crestview Corners Car Wash*, 370 S.W.3d at 35; TEX. R. APP. P. 44.1(a).

We overrule the State's third issue.

**D.     JURY INSTRUCTION**

In its fourth issue, the State argues that the trial court improperly instructed the jury that it could consider the perception that Johnson's remainder property will be less safe after the taking.

The jury charge included the following instruction:

> In considering the damages to the remainder of Mr. Johnson's property and the improvements located thereon, [sic] following the State's taking, you may consider the perception that, [sic] the remainder of Mr. Johnson's property will be less safe so long as you find by a preponderance of the evidence the following are true 1) there is a basis in reason or experience for the perception that Mr. Johnson's remainder property will be less safe following the State's taking, 2) that the perception that the remainder property will be less safe enters into the calculations of persons who deal in the buying and selling of property similar to the remainder property, and 3) the fair market value of the property will depreciate as a result of the perception that the remainder property will be less safe following the State's taking.

At the charge conference, the State objected to the instruction. On appeal, the State argues that the instruction should not have been given because: (1) the instruction did not conform to the evidence; (2) a court should not give an instruction based on evidence that was improperly admitted over objection and the opinions of Bolton and Shuler that the market will perceive the remainder property as unsafe were improperly admitted over objection; (3) the instruction improperly assumes the existence of a perception that the Remainder will not be safe; and (4) the instruction misstates the law because diminished market perception is not compensable.

The trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. A valid instruction (1) assists the jury, (2)

–28–

accurately states the law, and (3) finds support in the pleadings and evidence. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). A trial court has considerable discretion when framing a jury charge. *Imagine Automotive Group v. Boardwalk Motor Cars, Ltd.*, 460 S.W.3d 620, 645 (Tex. App.—Dallas 2014, pet. filed). We do not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *See id.*

"Charge error is generally considered harmful if it relates to a contested, critical issue." *Id.* If the trial court submits an incorrect jury instruction, we reverse only if the record shows that the given instruction was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *Id.*; TEX. R. APP. P. 44.1(a); *see also* TEX. R. APP. P. 61.1(a). When determining whether an erroneous instruction or definition probably caused an improper judgment, we examine the entire record. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010).

If we assume that the trial court erred by submitting the contested instruction, we cannot conclude that the alleged error resulted in an improper judgment based on this record. Although the issue of whether the market would perceive Johnson's property as less safe after the State's taking was contested, other evidence in the record supports the jury's award. The jury was presented with extensive evidence that the Remainder will no longer comply with the fire code because the New Access Road will be too narrow, the turning radii will be insufficient, and there will be an insufficient number of fire-department-access points to the Remainder. The jury also could have considered the evidence showing that response times from the fire department will increase by approximately two minutes, the office building on the Remainder will be rendered "unrentable and unsaleable" by the taking and the highest and best use of the Remainder will be for light industrial use, and Johnson will suffer a total, temporary denial of access. All of these problems considered together could have supported the damages award without consideration of

the market's perception of the Remainder.  After reviewing the entire record, we cannot conclude that the instruction, even if erroneous, caused the probably caused rendition of an improper judgment.  We overrule the State's fourth issue.

### E.    EVIDENCE OF DAMAGES

In its fifth issue, the State argues there is no evidence, or insufficient evidence, to support remainder damages of over $3 million.  The State's challenge is to both the legal and factual sufficiency of the evidence.  Citing its first, second, and third issues, the State argues that the evidence "was not competent to support remainder damages in the total amount of $3,059,535.74, as any evidence supporting such claims was irrelevant, unreliable, speculative and/or incompetent, and the claims for remainder damages on these bases were not compensable."

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding.  *Haler v. Boyington Capital Grp., Inc.*, 411 S.W.3d 631, 635 (Tex. App.—Dallas 2013, pet. denied).  There is "no evidence" when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.  *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)).  "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."  *Id.*  (quoting *Wilson*, 168 S.W.3d at 827).  We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.  *Id.*

When an appellant challenges the factual sufficiency of the evidence, we consider all the evidence supporting and contradicting that finding. *Thornton v. Dobbs*, 355 S.W.3d 312, 315 (Tex. App.—Dallas 2011, no pet.). In a factual sufficiency review, we consider all the evidence and determine whether the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *Id.* If the evidence falls within the zone of reasonable disagreement, we will not substitute our judgment for that of the fact finder. *Id.* at 316.

When valuing the loss in value of remainder property in a condemnation case, the fact finder is not entitled to depart from the range of value admitted as evidence. *See Harrell Ranch*, 268 S.W.3d at 258 (citing *Pleasant v. Bradford*, 260 S.W.3d 546, 560 (Tex. App.—Austin 2008, pet. denied); *Parallax Corp. v. City of El Paso*, 910 S.W.2d 86, 91–92 (Tex. App.—El Paso 1995, writ denied); *State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ) ("In a condemnation case, the jury is allowed to set the value at any amount between the lowest and highest values the expert witnesses put in evidence.")).

In this case, the jury was presented with three different valuations of the damages to the remainder of the Property.

Bolton testified that the market value of the fee simple interest of the Property before the taking was $4,928,000. He calculated the fair market value of the Remainder would be $694,052. Bolton concluded the State should pay Johnson the difference, or $4,233,948. During Bolton's testimony, the court admitted Defendant's Exhibit 89 over the State's objection. Exhibit 89 is a one-page document containing handwritten notes on lined paper. The exhibit states:

BOLTON SUMMARY

BEFORE:              $4,928,000

AFTER:               $694,000

TOTAL DAMAGE:  $4,233,948

Shuler testified that Johnson's Property is worth $5,720,000, if he assumed the State was not taking any of the Property.  He estimated that after the taking, the Remainder will be worth $1,000,000.  He also calculated that the value of the portion taken by the State would be $74,604.  Shuler concluded that Johnson's property was damaged in the amount of $4,645,396.  During Shuler's testimony, the court admitted Defense's Exhibit 206 without objection.  The exhibit also is a one-page document of handwritten notes on lined paper.  Exhibit 206 states:

SHULER'S OPINIONS

| | |
|---|---|
| PART TAKEN | $74,604 |
| REMAINDER DAMAGES | $4,645,396 |
| TOTAL DUE | $4,720,000 |

The State's real estate appraisal expert testified the value of the Property before the acquisition to be $3,250,900.  He also testified Johnson's property would not suffer damages because of the State's acquisition.  He testified that the value of the land that the State is acquiring is $49,100.  Because he believed Johnson would incur $10,650 to connect his existing driveway to the New Access Road, the State's expert testified that the State owed Johnson $59,750.

The State has not demonstrated there is no evidence supporting the jury's finding that Johnson is entitled to recover $3,059,535.74 for damage to his property.  Both of Johnson's experts testified the damage to the Remainder is more than $4 million.  The State's expert testified there would be no damage to the Remainder.  The jury's award of just over $3 million was well within the range of evidence presented at trial.  *See State v. State Street Bank & Trust Co.*, 359 S.W.3d 375, 380 (Tex. App.—Dallas 2012, no pet.).

After reviewing the record, including the evidence presented at trial, we conclude a reasonable and fair-minded jury could have reached the conclusion this jury did with respect to damages. The amount of the award was not against the great weight and preponderance of the evidence. We overrule the State's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.


/Jim Moseley/
JIM MOSELEY
111622F.P05                               JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-11-01622-CV      V.

RODGER A. JOHNSON, Appellee

On Appeal from the County Court at Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-08-08424-E.
Opinion delivered by Justice Moseley.
Justices Lang and Richter participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Roger A. Johnson recover his costs of this appeal from appellant The State of Texas.

Judgment entered this 6th day of August, 2014.